THE STATE, *ex rel.* THE ATTORNEY GENERAL, Respondent, *v.* GEORGE C. MILLER *et al.*, Appellants.

### January 31, 1876.

By an act of the General Assembly, approved January 16, 1833, the trustees of the town of New Franklin were authorized to raise, by lottery, $15,000, for the construction of a railroad from the bank of the Missouri river to the town of New Franklin. By act of February 26, 1835, they were further empowered to contract with any person to have the lottery drawn in any part of the United States, on such terms as they should consider most advantageous. By act of February 8, 1839, the power previously given to raise money for a railroad was withdrawn; the trustees were authorized to apply the funds raised to a macadamized road, and the Governor, on certain preliminary conditions, might, by proclamation, authorize the raising by lottery of a sum sufficient to complete the work, not exceeding $15,000. On November 17, 1840, proclamation was issued by the Governor to that effect. On June 1, 1842, the trustees made an agreement with Walter Gregory, whereby they sold to him " the said lottery and all right to control the same," and appointed him " the sole

manager and conductor of said lottery or lotteries, for the benefit of the town of New Franklin, under the provisions," etc. Gregory assumed all the risk and expense of the undertaking, and agreed to pay the trustees $15,000, in semi-annual installments of $250 each, beginning with January 1, 1843. A proviso was added whereby $1,100 previously paid to the trustees by other parties should be considered as payments made by Gregory on his said purchase. On April 11, 1849, the board of trustees entered on its minutes a memorandum of an agreement that, in consideration of $500 paid by Gregory, in addition to the $1,100 acknowledged by the contract of June 1, 1842, he was released from all further payments under said contract until July 15, 1851—the semi-annual installments of $250 then to commence, and to continue until the further sum of $13,400 should be fully paid, making, in all, $15,000. This memorandum purports to be signed and sealed by the trustees, but is not executed by Gregory. By act of December 6, 1855, "all contracts made by the said trustees for the purpose of raising the amount of money authorized to be raised" by the several acts above recited, "for the purpose of constructing a rail or macadamized road," etc., were declared to be legal, and the same might be carried out according to the true intent of the parties thereto. No part of the money raised by the lottery was ever applied to the making of a road of any kind. By an information in the nature of *quo warranto*, on the relation of the Attorney General, filed in the St. Louis Circuit Court, on the —— day of ———, 1875, the defendants, as assignees of Gregory, were required to show their authority for selling lottery tickets in Missouri. Judgment of ouster was rendered in the Circuit Court. It was *held* that the Circuit Court had jurisdiction of the controversy.

*Held* (BAKEWELL, J., dissenting), that the judgment of ouster was proper, and must be affirmed.

*Per* GANTT, P. J.—1. At any time prior to 1865 it was competent for the Legislature to either legalize or forbid the selling of lottery tickets, unless, by a contract with some person or persons, the power of prohibition was so far withdrawn. A right to sell, so vested by contract, could not be interfered with by general penal statutes against lotteries, or by any other instrumentality of the State governments.

2. The contract of June 1, 1842, must, in the light of its repeated sanctions by the Supreme Court, be considered unimpeachable. But, that contract having expired in 1870, by completion of the period which it covered, no one could have, under the acts of 1833 and 1835, and the contract of 1842, a right to sell lottery tickets in Missouri.

3. The contract of April 11, 1849, under which it is claimed that the privileges conferred on Gregory were extended in point of time, being wholly without consideration as to the trustees of New Franklin; being, in fact, a surrender of rights held under the former contract without compensation derived, or corresponding advantage of any sort; and being, not in furtherance of the objects contemplated by the act of 1833, but manifestly in

4

hindrance of them, was null and void. The act of December 6, 1855, gives it no support.

4. Although a seal, or a scroll by way of seal, imports a consideration, no presumption arises of a consideration different from that which is ascertained by the instrument itself; and if the declared consideration be illegal or worthless, while, in some cases, another may be proved, yet there is no legal presumption of the existence of such other consideration.

5. *Quære*, whether persons acting in a representative capactity can, by affixing a scroll to their signatures, shut the door upon an inquiry by their principals into the reasons for their action.

6. Even if the memorandum of April 11, 1849, were a binding contract, its operation would only be to extend the time within which Gregory was to make his payments, and to diminish, by loss of interest, the price of his purchase. It could not be understood as enlarging the privileges previously acquired by him, or that any such enlargement should be in precise proportion to his own failure of performance of the original contract.

7. Ever since 1870, when the last payment was due under the contract of June 1, 1842, the defendants have been without the protection of any contract to justify their selling lottery tickets in violation of the general law. Hence, the judgment of ouster was proper, and ought to be affirmed.

*Per* Lewis, J.—1. The contract of April 11, 1849, cannot be treated as a nullity in this proceeding. The State, by act of December 6, 1855, declared it to be legal, and gave her assent to its being carried out according to the intent of the parties.

2. The proceeding by information in the nature of *quo warranto* was a part of the common law, and so introduced into Missouri. The statute of Anne, and the corresponding statute of this State, in authorizing a private relator, did not take away the right of the government to appear by its law officer, as relator, in a common law court of original jurisdiction.

3. A municipal charter is a delegation of the State's sovereignty for local purposes, and is, in general, not judicially forfeitable, like a private franchise. But when to such a grant is added a special franchise, independent of the local government and operative beyond its limits, the latter is liable to forfeiture for non-user, misuser, or breach of condition. The lottery privilege granted to the corporation of New Franklin was such a franchise, and is shown to have been forfeited in every mode possible for the case.

4. The defendants and Gregory, their assignor, took the franchise subject to all the conditions, including the liability to forfeiture for certain causes. A judgment of forfeiture against them for such cause would not impair the obligation of their contract, but would simply enforce its terms.

5. The authority given the trustees to contract on such terms as they should "consider most advantageous," did not imply a right to create terms which would be in derogation of law.

6. The judgment of ouster was proper, for forfeiture of the franchise by failure of the conditions upon which it was granted.

*Per* BAKEWELL, J., dissenting.—1. The contract of April 11, 1849, whether legal or not upon general considerations, was validated by the act of December 6, 1855.

2. Consideration is not of the essence of a contract, though necessary to support one. A contract under seal needs no consideration, and is binding between the parties, not only without a consideration, but even when, as in this case, one is set out and appears to be no consideration at all, because already past.

3. A contract or agreement is where a promise is made on one side and assented · to on the other.

4. The general laws of 1836 and 1842, prohibiting lotteries, were inoperative as to the Missouri lottery, that being expressly authorized by the same power which uttered the prohibition. The prohibitory act of 1845 cannot be set up against the contract of 1849, because the latter was ratified and validated by the act of December 6, 1855. This ratification and validation did not constitute a law retrospective in its operation, within the meaning of the Constitution.

5. The lottery franchise could not be forfeited by any act of the trustees of New Franklin, after they had sold it to another. A judgment of forfeiture would impair the obligation of their contract of sale, which was made by authority from the State, and ratified by the same power.

6. The contract of 1849 having been in full force before the constitutional prohibition of 1865 against lotteries, no subsequent constitutional ordinance, or law, or decision of any court could impair its validity, and it is valid now.

7. Gregory and his assigns could not control the application by the trustees of the funds raised from the lottery, and, therefore, cannot be held responsible for any misappropriation of them after the transfer. The defendants cannot be deprived of their franchise because of such misappropriation; since that would be to assume that the Legislature gave to the trustees a right to make a sale which would be revocable at the legislative will.

8. Courts of justice cannot undertake to annul any legislation, within the constitutional authority of the General Assembly, for apparent rashness or improvidence in the enactment.

9. The Circuit Court had jurisdiction of this proceeding. It was never intended by the statute to limit the common law jurisdiction of the Circuit Court over *ex-officio* informations in the nature of *quo warranto*.

10. The judgment of ouster was improperly rendered, and ought to be reversed.

APPEAL from the St. Louis Circuit Court.

*Affirmed,* BAKEWELL, J., *dissenting.*

*D. T. Jewett,* for appellants, cited : Hequembourg *v.* Lawrence, 38 Mo. 555 ; McElhinny *v.* Stewart, 32 Mo. 379 ;

State *ex rel. v.* McBride, 4 Mo. 303 ; Attorney General *v.*
Ins. Co., 8 Mo. 330 ; Douglas *v.* Scott, 17 Mo. 521 ;
State *ex rel. v.* Stone, 25 Mo. 555 ; State *ex rel. v.* Lingo,
26 Mo. 496 ; Attorney General *v.* McAdoo, 36 Mo. 45 ;
State *v.* Bernoudy, 36 Mo. 279 ; Attorney General *v.* Wood-
son, 41 Mo. 227 ; State *ex rel. v.* Straat, 41 Mo. 58 ; State
*ex rel. v.* Buskirt, 41 Mo. 111 ; Attorney General *v.* Pool,
41 Mo. 32 ; Attorney General *v.* Vallé (Water Board), 41
Mo. 29 ; Attorney General *v.* Morrison, 41 Mo. 238 ; Attor-
ney General *v.* Churchill, 41 Mo. 41 ; State *ex rel. v.* Sher-
man, 42 Mo. 210 ; State *ex rel. v.* Kupferle, 44 Mo. 154 ;
Attorney General *v.* Pearcy, 44 Mo. 159 ; Attorney Gen-
eral *v.* Steers, 44 Mo. 223 ; State *ex rel. v.* Fitzgerald,
44 Mo. 425 ; State *ex rel. v.* Adams, 44 Mo. 570 ; Attorney
General *v.* Bishop, 44 Mo. 229 ; Attorney General *v.* Con-
rades, 45 Mo. 45 ; Attorney General *v.* Windser, 45 Mo.
346 ; Attorney General *v.* Boatmen's Savings Inst. 48 Mo.
189 ;   Attorney General *v.* Gilbraith, 48 Mo. 107 ; State *ex*
*rel. v.* Cape Girardeau R. R. Co., 48 Mo. 468 ; State *ex rel*
*v.* Weatherby, 45 Mo. 17 ; State *ex rel. v.* Bond, 46 Mo.
528 ; Attorney General *v.* Fiala, 47 Mo. 310 ; State *ex rel.*
*v.* Searl, 50 Mo. 268 ; Attorney General *v.* Vail, 53 Mo. 97 ;
Attorney General *v.* Townsley, 56 Mo. 107 ; State *ex rel.*
*v.* Coffee, 59 Mo. 59 ; State *v.* West Wisconsin R. R. Co.,
34 Wis. 197 ; State *v.* Hawthorne, 9 Mo. 389 ; State *v.*
Morrow, 12 Mo. 279 ; State *v.* Morrow, 26 Mo. 131 ; State
*v.* Miller, 50 Mo. 129 ; Ang. & Ames on Corp., sec. 736, and
High, secs. 680, 690 ; 2 Dill. on Mun. Corp. (2d ed.), sec.
720 ; Hull *v.* S. R. R. Co., 21 Law Rep. 138 ; Sturgis *v.*
Knapp, 34 Vt. 60.

*James O. Broadhead*, for appellants, cited :   Hamilton *v.*
St. Louis County, 15 Mo. 3 ; Barton County *v.* Watson, 47
Mo. 189 ; People *v.* Power, 25 Ill. 190 ; East Hartford *v.*
Hartford Bridge Co., 10 How. 533 ; Dunklin County *v.*
District Court, 23 Mo. 449 ; Reardon *v.* St. Louis County,

36 Mo. 555; Hannibal & St. Jo. R. R. Co. *v.* Marion County, 31 Mo. 303; Gelpcke *v.* Dubuque, 1 Wall. 266; State *ex rel. v.* Cape Girardeau, etc., 48 Mo. 471; State *v.* Miller, 50 Mo. 133.

*C. P. Ellerbe*, for Police Commissioners, and of counsel for State, cited: Routroug *v.* Wolff, 35 Mo. 174; Hope Mutual Fire Ins. Co. *v.* Flynn, 38 Mo. 483; Fowler *v.* City St. Joseph, 37 Mo. 228; City St. Louis *v.* Clemens, 52 Mo. 144; State *v.* Hawthorne, 9 Mo. 389; State *v.* Morrow, 12 Mo. 289; State *v.* Miller, 50 Mo. 129; 2 Wall. 45; 3 Wall. 377.

*John A. Hockaday*, Attorney General, and *Frank J. Bowman*, for the State, cited: 16 Me. 224; 6 Cow. 196–211, 217; 4 Wheat. 558, 559; 2 Mo. 169; 5 Mass. 230; 9 Wend. 351; 9 Cranch, 43–51; 2 Mo. 169; 6 Ired. (N. C.) 460–456; 23 Wend. 254–537; 21 Wend. 235; 4 Cush. (Mass.) 60–62; 5 Ired. (N. C.) 309; 20 Penn. 185; 8 Pet. 281; 19 Md. 239; 11 Ala. 472; 16 Mass. 102; Attorney General *v.* Petersburgh & Roanoke R. R. Co., 6 Ired. (N. C.) 456; Attorney General *v.* Washington & Baltimore T. R., 19 Md. 239; State *ex rel. v.* Cape Girardeau & St. Louis R. R. Co., 43 Mo. 112; High. on Rem. 440; 32 Mo. 38; 35 Mo. 135; Whittlesey's Pr., title Quo Warranto, and cases there cited; Acts of 1845, p. 723; Acts of 1843, p. 85; Rev. Code of 1835, p. 398; Cooley on Const. Lim., side secs. 91, 92; Dwar. on Stat., 2d note to p. 69, and p. 365; Cooley on Const. Lim. 175; 27 Penn. 456; 44 Mo. 572; 5 Gray (Mass.), 100, Sec. 10 of Art. 14, Const. of 1875.

GANTT, P. J., delivered the opinion of the court.

The State of Missouri, by the Attorney General, filed in the St. Louis Circuit Court an information in the nature of a *quo warranto*, charging that defendants carried on the business of selling lottery tickets in St. Louis, denying the lawfulness of their so doing, and inquiring by what warrant they claimed to do it. The appellants answered that they

were protected in selling lottery tickets, etc., by force of a contract, dated June 1, 1842, made by authority of the State, between themselves and the trustees of the town of New Franklin, and modified by another contract, made April 11, 1849, transferring to them, the appellants, the lottery franchise given to the trustees of the town of New Franklin by an act of the General Assembly, approved January 16, 1833, and that the period for which they were thus authorized to enjoy this privilege was unexpired.

· By section 7 of the act of January 16, 1833, it was declared that the board of trustees of the town of New Franklin should have power * * * " to raise, by lottery, a sum of money, not exceeding $15,000, for the construction of a railroad from the bank of the Missouri river to the town of New Franklin," etc. On February 26, 1835, the board was authorized " to contract with any person to have said lottery drawn in any part of the United States, on such terms as they should consider most advantageous, and that they should have the same privileges as to the sale of the tickets in this State as heretofore, until the amount authorized in said act be raised." ·

By an act of the General Assembly, approved February 8, 1839, so much of the act of January 16, 1833, as provided that the board of trustees of the town of New Franklin should have power to raise, by lottery, a sum not exceeding $15,000, for the construction of a railroad, etc., was repealed. The board was authorized to apply the funds raised, and to be raised, to the construction of a macadamized road, and it was provided that the governor, on receiving a report from the trustees as to the disposition of the funds already raised, and the work already done, might authorize, by proclamation, the raising, by lottery, of a sum sufficient to complete the work, not exceeding $15,000. On November 17, 1840, the governor issued his proclamation authorizing the board of trustees of the town of New Franklin to raise, by lottery, $15,000. On June 1, 1842,

an agreement was made between the trustees and Walter Gregory, reciting that the trustees had already contracted with Gray and Eicholtz to raise for them the sum of $15,000. That this agreement had been assigned to Gregory, and was, by consent, abandoned by both parties; and that the trustees sold to Gregory " the said lottery, and all right to control the same," and appointed him "the sole manager and conductor of said lottery or lotteries, for the benefit of the town of New Franklin, under the powers above recited," etc. Gregory assumed all the risk and expense of the undertaking, and agreed to pay to the trustees $15,000, in installments, as follows: $250 on January 1, 1843; $250 on June 1, 1843, and *so on*, paying $250 semi-annually (the two payments given as examples are not at semi-annual intervals), until the sum of $15,000 is fully raised, to the said trustees, provided that $1,000 heretofore paid by Gray and Eicholtz, and $100 paid by Hawthorne, should be considered as payments, in order as made, on the above installments by Gregory. It was further provided that Gregory should not be bound by this agreement in the event of interference by the judiciary, legislative, or executive departments, in which case he should be only bound to pay the installments to the time of the interference. He also reserved to himself the right to abandon the contract at any time, and to assign it at pleasure. He gave approved security in the penal sum of $30,000 for the performance of the contract on his part, as required by the act of February 8, 1835.

On April 11, 1849, the board of trustees, etc., entered on their minutes a memorandum of an agreement that, in consideration of $500 paid by Walter Gregory, in addition to the sum of $1,100 paid on the contract dated June 1, 1842, he was released from all further payments under said contract until July 15, 1851, the same annual installments of $250 then to commence and continue, according to the terms of the contract, " until the further sum of $13,400

should be fully paid, making the sum of $15,000 in all."
This memorandum, as set out, purports to be signed and
sealed by the trustees. It is not executed by Gregory.

On December 6, 1855 (p. 467 of Session Acts), the
General Assembly enacted "that all contracts made by
the said trustees for the purpose of raising the amount of
money authorized to be raised by the said act of incorpora-
tion and the act amendatory thereof, for the purpose of
constructing a rail or macadamized road from the bank of
the river to the said town, be, and the same are hereby,
declared to be legal, and may be carried out according to
the true intent and meaning of the parties thereto." The
title of this act was: "An act to authorize the trustees of
the town of New Franklin to construct a plank road."
The first part of the section quoted authorized them to con-
struct a plank road, instead of a rail or macadamized road,
"as provided for in an act entitled, etc., approved the 6th
of January, 1833, and an act approved the 8th of February,
1839, to amend the first act."

There was evidence of what may, without the least injus-
tice, be termed a total misuser by the trustees of the town
of New Franklin of the funds received from Gregory and
his assignees.

The appellants, defendants below, claimed that the Cir-
cuit Court had no jurisdiction of the information, for want
of a private relator. They also claimed that they had, for a
term yet unexpired, the privilege of selling lottery tickets
in Missouri by virtue of a contract, valid and binding, made
by them with the trustees of the town of New Franklin;
and that they were unaffected by any misapplication of the
funds paid by them to the trustees.

The State insisted that the Circuit Court had jurisdiction
of the case; that the contract of 1842 was itself void, as
being made in violation of existing laws; that the contract
of 1849 had no validity whatever; that it does not profess
to have been executed by Gregory; that there is no legal

evidence that it was executed by the trustees, etc., of New Franklin; that it was destitute of all obligations, for want of any consideration to support it; that the assignees of the lottery franchise are bound to take it *cum onere*, and to see to the fulfillment of the conditions on which it was given to the town of New Franklin; that the so-called contract of 1849, admitting it to be valid and binding so far as to extend the time of payment of the money contemplated and secured by the contract of 1842, did not contemplate, and cannot be presumed to contemplate, that the period during which the lottery franchise was to be enjoyed should be enlarged by the neglect of appellants to pay the price stipulated in 1842 for the enjoyment then ascertained, and that any misapplication of the funds raised, committed by the trustees, would forfeit the privileges of their assignees.

The Circuit Court decided that it had jurisdiction of the information, and gave judgment of ouster against appellants, who bring the matter before us by appeal.

1. The first question, as to the jurisdiction of the Circuit Court, I consider to be settled by the decisions of the Supreme Court of Missouri. *State* ex rel. v. *Stewart*, 32 Mo. 379; *State* ex rel. v. *Cape Girardeau Railroad Co.*, 48 Mo. 468. If the question were an open one, I should be inclined to take the same view; as it is, I do not think it proper to do more than accept the decision of the court of last resort.

2. Much was said at the hearing in this court of the bearing on the question before us of the statute of Missouri which, since 1836, has punished as a misdemeanor the selling of lottery tickets, and of the Constitutions of 1865 and 1875. It was contended that all contracts made between 1836 and 1865, for the sale of lottery tickets in Missouri, were void as being contrary to her penal laws; and that all laws passed since 1865, seeking to legalize lotteries, were void as being contrary to the Constitution of that year.

It is plain enough that, since 1865, the General Assembly

has had no power to legalize a lottery, or license the sale of lottery tickets in Missouri, but our attention has not been called to any act of the General Assembly, passed since the Constitution of that year took effect, in which such a power is asserted. As to the period before 1865, it cannot be successfully claimed that the General Assembly had not the power to legalize lotteries if so minded, and it also possessed the power of being partial in the permission of this privilege. By virtue of its general power it could at any time make penal this or any other act, not within the prohibitions of the Federal or State Constitution. If at any time it seemed expedient to prohibit by law the selling of lottery tickets and the carrying on of a lottery, it was clearly competent for the General Assembly to do this ; but, if the right to do this business had been vested by contract in any person, then the subject was to that extent withdrawn from the general power of the State, and the party having such contract could only be proceeded against under its terms. Accordingly, if there were a valid contract between the appellants and the trustees, etc., of New Franklin, by means of which appellants acquired the right of selling lottery tickets for a definite period, the State could not, by any instrumentality of its people or government, impair the obligation of that contract. It is essential to the idea of a binding contract that it should be in conformity with the will of the people as declared in its laws ; that it should rest upon a good or valuable consideration ; and that it should be made in good faith. If wanting in any of these elements it cannot be said to have any obligation which the law will recognize ; but, having them, it is the principal function of courts of justice to give effect to the engagements which men thus form. Sometimes this is done by decreeing their specific performance ; oftener by giving damages for their nonperformance. The mode of doing these things is necessarily committed to the good faith of the State ; and government may be almost said to be good or bad in exact

proportion to the thoroughness or remissness with which this duty is performed. But the fundamental rule contained in the Federal Constitution, and repeated with great emphasis and amplitude in the organic law of Missouri, requires that, whatever else is done, the obligation of a contract shall not be impaired. This injunction has always been observed, and will always be observed, by the courts of Missouri. A contract may be brought before them the terms of which are harsh and unequal; but, if the parties with their eyes open have chosen to make such a contract, a court can and will do nothing to impair such obligation as it professes. It will listen to any suggestion of fraud, want of consideration, illegality, or matter of discharge; and will determine according to its best discernment whether the contract had any original validity, or whether, being originally valid, its obligation has been satisfied. But, if it be unassailable for these or similar reasons, the law must take its course, without any regard to the real or fancied condition of public sentiment, or what may be thought of public policy. The policy of a State can be known to a court of justice only by the laws of that State. These furnish the only authentic expression of the public will, and to every other evidence of it courts should be deaf and blind.

The contract of 1842 must, I apprehend, be regarded as unimpeachable. This is the view of it taken by the Supreme Court of Missouri (*State* v. *Morrow*, 26 Mo. 131), in which the validity of that contract was directly impeached. No reference was made then, or at any time, by the court of last resort, to the supposed contract of 1849, but the contract of 1842 is distinctly upheld. By this decision all courts are bound. A regret may be felt that the case in which that decision was reached did not lead the court to scrutinize the features of that contract—to note the differences between the end proposed by the Hospital lottery and the New Franklin lottery, the desirableness, at least the *possible* desirableness, in the one case, of receiving the money

raised in minute installments distributed over an extended period, and the absolute, almost ludicrous, inconsistency of such a mode of payment with the design of building a railroad. The trustees of New Franklin, in 1842, professing to contemplate the building of such a road at a cost of $15,000, and having at their disposal only one resource for raising that sum, converted the fund derivable from this source into an annuity, for thirty years, of $500, payable semi-annually; that is, they agreed to receive just 3 1-3 per cent. per annum for thirty years of the sum, the whole of which was, by hypothesis, needed to build the road. No one in his senses could imagine that the road could be built, during the whole period, by means of this annuity; and the conduct of the trustees, who failed to appropriate a dollar of this money towards this object, was in a certain sense judicious. To apply money in such driblets to such an enterprise would be merely throwing it away. By reducing their means as they did by this contract, they so palpably disabled themselves from accomplishing their professed purpose that it is not easy to understand that this purpose was seriously contemplated by any party to that instrument. But the decision quoted, especially in the light of the act of December 6, 1855, closes all inquiry into the validity of that contract, or any other made prior to December 6, 1855, professing *on its face* to be made for "the purpose of raising the amount of money authorized to be raised by the said act of incorporation   *   *   *   for the purpose of constructing such road   *   *   *   from the bank of said river to said town." But no contract not having (at least *on its face*) such a purpose can be aided by this act.

The State now claims that the contract of 1842 has expired; that the period it covered has been completed; and that appellants can no longer invoke its aid. This would appear to be true. At the date of that contract $1,100 had been raised and paid to the trustees, etc., of New Franklin, and only $13,900 remained to be raised and

paid to them.   The payment of this sum was provided for
by the engagement of Gregory to pay $500 annually, begin-
ning in 1843.   The answer sets up that ample security was
given for the performance of this engagement.   The last
payment would be $150, payable June 1, 1870, and there-
after, according to the terms of that contract, no one
could have, under the acts of 1833 and 1835, and the
contract of June 1, 1842, the right to sell lottery tickets
in Missouri.   But appellants insist that the period during
which such selling was legalized was extended by the con-
tract of April 11, 1849.

To this the State replies that this contract appears, on
its face, not to have been executed by Gregory; that it
does not appear to have been executed by the trustees of
New Franklin; that it is unsupported by any consideration,
and so has no obligation; that it is not a contract having
for its purpose the raising of money in furtherance of the
objects contemplated by the act of 1833, but the hindering
and obstructing of those objects; and that it does not,
assuming it to be within the powers of the trustees for all
the objects which are within its scope, profess to extend the
duration of the privilege of selling lottery tickets, but only
the time within which payment is to be made for that
privilege; in short, that it grants relief to Gregory in
respect of his engagement to pay the price, and virtually
accepts the payment of a smaller sum than the engagement
of 1842 contemplated; but that it does not profess to give
him a larger privilege for this reduced price.

We cannot look into the question of the authenticity of
the contract dated April 11, 1849.   That point was decided
by the Circuit Court in favor of appellants, and the State
did not except to that decision.

The other objections appear to be better founded.   By
no definition we have been able to find, of what the law
intends by a consideration, can we reach the conclusion
that this contract of 1849 rested on that essential support.

By its terms it is not so much confessed as proclaimed that Gregory had not paid one dollar since June 1, 1842, when $1,100 had already been paid by others and credited to him. The trustees had, as we are bound to conclude from the answers of appellants, the right to receive and the power to exact from him, for arrears of installments due before April 11, 1849, the sum of $3,250, besides interest. In like manner they would, between that period and June 1, 1851, have the right to receive and the power to exact from him, under his engagement of 1842, the further sum of $1,250, besides interest; making a total of $4,500, of which more than two-thirds, with interest, was due at the date of the contract. In place of all this, those trustees agreed to receive in hand, without interest, only $500, to suspend any further payment until July 15, 1851, taking no interest for the forbearance, and to receive, then and thereafter, the suspended installments at the old rate. It was declared that there would be payable, on and after July 15, 1851, the sum of $13,400; and this proves, in a manner which leaves no room for doubt, that all interest was remitted, and that the total of the sum received and to be received, first and last, by the trustees, from Gray and Eicholtz, Hawthorne and Gregory, was the sum of $1,100 paid before 1842, the sum of $500 paid in 1849, and $13,400 to be paid in and after July, 1851, or $15,000 in all. No allowance whatever being made of interest for the time that payment was delayed, nothing is clearer than that this was contemplated and provided for by that paper of April 11, 1849. Has such a transaction any validity? Has such a contract any obligation?

Clearly, nothing was given or done by Gregory in return for the enormous concession he obtained from the trustees. There was no possibility of benefit to the latter; all that appears, or that can appear, was net loss to them. It is, indeed, declared that the agreement was made in consideration of $500 paid by Gregory. But it is manifest that at

this time Gregory was bound to pay them more than six times this sum, with interest. The payment of this small percentage of a debt overdue and secured can be no consideration for a new promise. On the face of the paper it is plain that the trustees neither got, nor expected to get, any thing in return for the indulgence they extended to Gregory.

But this contract purports to be under seal; and it is said that a seal imports a consideration. It can hardly be contended that this presumption goes so far as to substitute a different and sufficient consideration for that ascertained by the instrument itself. The rule of law giving a different effect to a contract to which a scroll is appended, by way of seal, from that which it would have had but for this very formal and technical addition is not one to which any respect would be given at this day but for the remote age in which it originated. The reason of the rule has long ceased, but courts of justice will leave its abrogation to the legislative power. There is, however, a rule, quite as well settled as that which has just been quoted, which declares that where the consideration is expressed in a written instrument no other can be proved, unless there are words which indicate other considerations, or where the consideration proved is of the same kind, but different in degree, as the amount of a money consideration. But no rule of law of which I am aware will raise a presumption, either in a sealed or unsealed contract, of a consideration different from that declared; and if that which is set forth and dignified with the name of a valuable consideration be described, and appear by the description to be something wholly frivolous, I am unacquainted with any principle by force of which we can infer, without evidence, that there was another and sufficient consideration. The party to such a contract may possibly be allowed *to prove* an additional consideration; but it is not to be gratuitiously inferred merely because a scroll, by way of seal, is affixed to the paper with the signature of the contractor. It may also be doubted whether a

person executing a contract in a representative capacity can,. by using a seal, shut the door to an inquiry into the sufficiency of the reasons for which he undertakes to conclude his principal. In the case under examination we are informed, with a fullness which leaves nothing to be desired,. that, for no possible advantage to the town of New Franklin,. but for the mere accommodation of Gregory, the trustees. of that town saw fit to relieve him of part of the obligation of his contract of 1842. No room is left for presumption. The paper tells the whole story. It is difficult to see on what grounds such an attempt on the part of trustees could find favor or toleration in a court of law. To give it effect. would be to sanction what is at best a perfectly gratuitous betrayal of their trust; and I do not think that the act of December 6, 1855, gives this attempt the least support. Whatever else may be said of the contract of 1849, its. purpose was not to raise money for building the contemplated road. Its aim, proclaimed on its face, was to delay and hinder the raising of that money, to impair, and partially to discharge, a contract previously made which had been considered to have in view the raising of such money.

This is not all. If the immense concession be made that. the contract of 1849 was protected by the act of December 6, 1855, the meaning of that contract is still to be ascertained. There can be no doubt that its scope was to extend the time within which Gregory was to pay for the privileges. he acquired by the contract of 1842, and it seriously diminished the price he was to pay for them. The argument of the appellants is that it did not stop here; that, besides diminishing the price to be paid, it increased the acquisition for which it was payable, and annexed a reward to Gregory's failure to perform his contract; that it enabled him, by delaying or refusing performance, to prolong the enjoyment of the privileges for which performance was to be the equivalent. For conclusions so anomalous we are surely entitled to demand the support of the most unequivo-

cal declarations of intention.  If the doing of this monstrous thing were clearly within their power, it would still be proper to demand that the utmost precision and clearness of language should be used by the trustees to set forth an intention to accomplish what so nearly resembles a wanton breach of trust.  We examine the language employed, and have no difficulty in acquitting the trustees of the intention imputed.  It nowhere appears.  All that the contract of 1849 really effects is, at most, a diminution of the price to be paid by Gregory for the lottery franchise purchased in 1842.  The price then stipulated was secured, and must be taken to be within the possession of the trustees, according to the terms of that security.  Whether Gregory or his sureties could have pleaded the contract of 1849 in bar or in abatement of a suit to enforce that security according to its tenor, is another matter; but there is no suggestion that there was a suspension of the enjoyment of the franchise during the time that payment for it was withheld, and there is no shadow of reason for extending the term of this enjoyment in consideration of the failure of Gregory to pay for it. I am, therefore, of the opinion that for more than five years the appellants have been without the protection of a contract to justify them in selling lottery tickets in Missouri.

I think it unnecessary to express an opinion upon the effect on the assignees of Gregory of the misuser, by the trustees of the town of New Franklin, of the fund raised under the contract of sale; but, for the reasons here stated, I think the judgment of the Circuit Court should be affirmed.

LEWIS, J., delivered a separate opinion.

I concur in the affirmance of the judgment rendered by the Circuit Court, but for reasons slightly variant from those given by the learned presiding judge.  I am unwilling to say that, for the purposes of this proceeding, the alleged contract of April 11, 1849, may be treated as a nullity.  It

may be true that no better terms were thereby secured to the trustees of New Franklin, and that, in fact, the extensions of time for payments were less favorable to their interests than the stipulations, if fulfilled, of the original contract. But the same may be said of every release or extension by an obligee, which is none the less effectual on that account, as between the parties themselves. Nor can the State, in any case, impeach the validity of that transaction, if by her assent she has waived whatever rights it assailed. The act of December 6, 1855, declared the State's assent to " all contracts made by said trustees for the purpose of raising the amount of money authorized to be raised by the said act of incorporation, etc., for the purpose of constructing a rail or macadamized road," etc. Such contracts were declared to be " legal," and might be " carried out according to the true intent and meaning of the parties thereto." If it can be shown that this act covered the transaction of April 11, 1849, no question remains, in my view, of the validity of the latter for all the purposes of this case. Against it are pitted, in the nature of the proceeding, some supposed rights of the State. But if all such rights have been waived by the State there is an end of their power to defeat it.

It is argued that the act of 1855 could not include the transaction of April, 1849, because it is limited to " all contracts," and that transaction was not a legal contract. But, if not that, what contract did the act embrace? All the prior contracts had then been declared by the ultimate judicial authority to be valid and unimpeachable. Did the Legislature undertake to validate what was already valid? It must be presumed that the act was passed to accomplish some object; and, as it was mere waste paper so far as the other contracts were concerned, it could have no possible application, unless to that of 1849. The very fact that the validity of this was doubted upon real or supposed grounds—especially with reference to the prohibitory acts

of 1842 and 1845—furnishes proof of its being in the legis-
lative contemplation, which is wholly wanting in the case of
contracts to which no validating aid was necessary.   The
use of the word "contract" does not always imply a valid
or legal contract.   Law writers and courts habitually tell
us of contracts that are void.   If the term, in whatever con-
nection, must always be held to mean only a legal contract,
then the writers and the courts must be interpreted to mean
very different things from what they manifestly do mean.
The same might be said of the word "deed" in its various
applications.   I think the word "contract" was intended
by the Legislature to cover every transaction having a
semblance of such, and coming within the further descriptive
limitations expressed.

It is further objected that this transaction was not one
"for the purpose of raising the amount of money author-
ized," etc., in the language of the act of 1855, but was for
the purpose of releasing some dues and extending the time
of others.   Undoubtedly it did relieve Gregory of obliga-
tions incurred under the contract of 1842.   If it had stopped
there, no more money would have been raised.   But it
proceeded to stipulate for future payments, in a new series
of its own creation.   It was, so far, whether better or worse
than the former, a contract for the purpose of raising
money, etc.   It was, at all events, a mere modification, as
to time, of the contract of 1842, and was, similarly to that,
within the general scope of the original grant of power.   I
cannot doubt that it was in the direct line of the legislative
view when the act of 1855 was adopted.

Upon the question of jurisdiction in the Circuit Court, I
have no doubt whatever.   The proceeding by information
in the nature of *quo warranto* was a legitimate offshoot from
the ancient criminal information, which is coeval with the
common law itself.   It was in use against usurpations of
the prerogatives of the crown far more than long enough
ago to make it a part of the common law as imported into

Missouri. No private relator was ever admitted until the statute of 9 Anne. That statute, from which ours is literally copied in the particulars affecting this inquiry, has always been held to have merely enlarged the operation of the ancient proceeding. As a prerogative remedy, to be used in the common law courts without a private relator, the information in the nature, etc., remained as before. So, in Missouri, the statute does not abridge the State's right to appear by her proper officer in a court of record of common law jurisdiction, and by this remedy to resume a forfeited franchise.

A municipal charter is understood to be a delegation of the State's sovereignty, to be exercised for certain local purposes over a defined district. Such a grant is not judicially forfeitable, like a private corporate franchise. But to these grants are sometimes added franchises which constitute no feature in the local government, and may be operative beyond its territorial limits, although for the special benefit of the inhabitants of the municipal district. Such was the authority given the city corporation of New York to construct the Croton aqueduct, through which water is conveyed into the city over many miles beyond the corporate limits. In *Bailey* v. *The Mayor, etc., of the City of New York*, 3 Hill, 539, the court, in classifying such grants, said: "The distinction is quite clear and well settled, and the process of separation practicable. To this end regard should be had, not so much to the nature and character of the various powers conferred, as to the object and purpose of the Legislature in conferring them. * * * Suppose the Legislature, instead of the franchise in question, had conferred upon the defendants banking powers, or a charter for a railroad leading into the city, in the usual manner in which such powers are conferred upon private companies, could it be doubted that they would hold them in the same character, and be subject to the same duties and liabilities? * * * These powers, in the eye of the

law, would be entirely distinct and separate from those appertaining to the defendants as a municipal body. So far as related to the charter thus conferred, they would be regarded as a private company, and be subject to the responsibilities attaching to that class of institutions." Numerous authorities, English and American, illustrate the same distinction.

The charter of New Franklin was municipal, so far as it provided for regulating the affairs of the inhabitants within the territorial limits defined in the act. But, when it authorized the building of a railroad from the town to the river, the drawing of a lottery for that purpose, and the contracting for such drawing in any part of the United States, it granted a private corporate franchise, which, like any other of that class, was liable to judicial forfeiture for non-user, misuser, or breach of the conditions of the grant. It has long been settled that one of several franchises in a charter may be forfeited without its affecting the others.

The testimony in the present case discloses grounds of forfeiture as positive, and almost as numerous, as ever before tainted the annals of our jurisprudence. The sole object of the franchise has been trampled under foot by those who were charged to promote it. The money raised for that object has been squandered upon others wholly foreign and unauthorized.

But can the defendants here, as Gregory's assigns, be subjected to the consequences of a forfeiture incurred by the trustees of New Franklin? The 3d section of the act of February 26, 1835, authorizes the commissioners of the hospital lottery " to contract with any person to have *said lottery* drawn in any part of the United States," etc. The 6th section permits the trustees of New Franklin to exercise the same powers "in relation to the authority *they now have* to raise by lottery a sum of money," etc. Can it be pretended that these provisions enabled the trustees to invest another with more than had been bestowed upon

them? Whatever contract might be made, the law would enter into and become part of it. By that law the lottery franchise was conditional, and could not exist a moment after forfeiture for breach of the condition. The State could never have intended to surrender her ultimate right by authorizing a transfer of the intermediate.

Gregory must be regarded either as an assignee under legislative authority of the franchise itself, or as an agent of the trustees who retained it. In either event the controlling principles are the same. An agent cannot lawfully do more than his principal might, nor can an assignee hold more than his assignor was able to convey. The State's surrender of her right of forfeiture for condition broken must appear in express terms, without which it can never be presumed. No such surrender can be discovered in the legislation which authorized the making of the contract.

Gregory, with all the law before him, knew that he could acquire nothing in the premises except by virtue of the legislative authority. His acceptance of anything was a virtual agreement to abide by the conditions upon which that authority was given. An exercise of the State's reserved right of forfeiture for breach of condition, therefore, so far from impairing the obligation of his contract, would be simply enforcing its terms.

But it is here objected that Gregory could not compel the trustees to apply his payments to the object of the franchise, and should not be held responsible for their misappropriation. I cannot admit either proposition. When he purchased he knew that the trustees, independently of what good faith to him required, were bound by law to apply the purchase money to a certain purpose. Is it possible that they could, by any act or omission, willfully violate a public duty, threatening destruction of the right they had granted to him, and yet leave him remediless? Whether this be so or not, he had it in his power to stipulate for such an application of the money as would protect

his acquisition. The State cannot be deprived of her ultimate right of forfeiture by his reckless faith in the fair dealing of the trustees.

I attach no importance to the authorization of the trustees to contract " on such terms as they shall consider most advantageous." No terms could be implied which would be in derogation of existing law.

·The defendants, as Gregory's assigns, stand in no better position than he did. I am, therefore, of opinion that the judgment of ouster ought to be affirmed.

BAKEWELL, J., dissenting.

This is an information in the nature of a *quo warranto*, filed by the Attorney General in virtue of his office, by which the appellants (respondents below) are called upon to show by what warrant of law they exercise the franchise or privilege of drawing a lottery in the State of Missouri. The information recites several acts of the Legislature, and contracts, or alleged contracts, by which the alleged franchise is claimed by appellants to have been granted, conveyed, and extended; and sets forth that appellants maintain fifty-two offices in St. Louis where lottery tickets are sold and drawings made, by which means appellants receive large profits, said to be $1,000 a day.

The information further sets forth that the said lottery franchise was granted for the purpose of building a plank road from the town of New Franklin to the Missouri river, for the relief of the town; that the moneys arising from the lottery franchise have not been appropriated for the charitable purpose for which they were designed; that no such road exists; and that, since 1862, the trustees of the town have misappropriated the funds derived from said lottery. It is claimed that by reason of such misuser and non-user the appellants have forfeited all pretended right to run the lottery.

It is further charged that the contract of 1849, by which it was attempted to extend the time during which the lot-

tery might be drawn, is illegal, and not validated by the act of 1855 relating thereto.

Appellants, in their answer, admit that they claim the franchise granted to the town of New Franklin as alleged, and are now exercising said lottery franchise by virtue of the act of Assembly and agreements set forth in the information, and also by virtue of other legislative enactments referred to in the answer, and also by conveyance from the grantees of the contracts mentioned in the information. They say that they purchased the right to run the lottery since the passage of the act of December 6, 1855, and under the belief that the modification made in 1849 of the contract of June 1, 1842, was by said act made valid and binding; and they plead the act as part of their title. They say that they have complied with the contract of 1842, as modified by that of 1849, but have no knowledge as to how the trustees of New Franklin have applied the funds received from appellants under that contract. They deny that the profits of the lottery are as great as charged.

Judgment of ouster was rendered by the Circuit Court, and from that judgment appeal is taken to this court.

It appears from the evidence and admissions of record in this case that, in 1833 (2 Terr. Laws, 327), the General Assembly granted the charter for a lottery for the benefit of the hospital of the Sisters of Charity of St. Louis, to raise thereby $10,000, through commissioners named for that purpose; and at the same session the Legislature incorporated the town of New Franklin, and in the act of incorporation created a board of trustees to have charge of the municipal affairs of the town. These trustees were, by this act, authorized to raise $15,000, by lottery, to build a railroad from the Missouri river to the town. This was an act of charity—the old town having been washed away by floods, and the inhabitants being compelled to retire to the bluffs about a mile and a half off. In 1835 an amendatory act was passed, authorizing severally the commissioners of the

hospital lottery, and the trustees of the town of New Franklin, to contract with any person or persons to have said lotteries drawn in any part of the United States, and on such terms as they shall consider most advantageous. In 1839 another amendatory act was passed relating to the New Franklin grant alone, by which the governor was authorized to make inquiry as to how much money had been received, and how much it would take to complete the road, and to issue his proclamation authorizing the trustees of New Franklin to raise such sum, not to exceed $15,000, by lottery; the road was also hereby changed to a macadamized road instead of a railroad. On November 17, 1840, Governor Boggs issued his proclamation according to law, and a contract was made with Gray and Eicholtz, who, after paying over some money under their contract, shortly abandoned it, and, on June 1, 1842, the trustees of New Franklin made a contract with Walter Gregory, by which they sold him the lottery and all right to control the same; $1,000 heretofore paid by Gray and Eicholtz, and $100 from Hawthorne, were to be considered as payments, and the balance of the original $15,000 to be paid in semi-annual installments of $250 each, beginning January 1, 1843. (The full payment of $15,000 would, therefore, be completed on July 1, 1870.) Gregory is to assume all risks and pay all prizes. If installments are not paid, the contract may be forfeited on forty days' notice. The parties are not to be bound by the agreement in case of legislative, judicial, or other interference, so that Gregory cannot conduct the lottery; and he has the right to assign or abandon the contract on ninety days' notice to the trustees. This contract and sale was passed upon by the Supreme Court, in 1845, at the October term, and again, in 1848 (*State* v. *Hawthorne*, 9 Mo. 390; *State* v. *Morrow*, 12 Mo. 279), in passing upon the contract for the hospital lottery, declared to be essentially the same (*State* v. *Miller*, 50 Mo. 132), and it was decided that the commissioners were authorized to sell the

lottery, that the sale to Gregory was valid, and that any act of the Legislature prohibiting the sale of lottery tickets. in this State would be void as to the vendee, Gregory, and his legal representatives, and in no way impair his or their rights acquired by said sale.

In April, 1849, the trustees of New Franklin and Walter Gregory agreed upon a modification of the contract of 1842 as to the times of payment. But for this modification, in view of the legislation on that subject in this State, there can be no question that all lotteries have been illegal since 1870. The question to be decided in this case is whether, in view of the acts of the Legislature in regard to lotteries, and the constitutional prohibition of them first adopted in 1865, the alleged contract of 1849 can be upheld. If it is valid, the Missouri lottery cannot be abolished in this State, without the consent of its proprietors, until 1877 ; if this contract is void, its drawings have been illegal since 1870.

I have considered the questions of law and fact involved in this case with all the care of which I am capable, fully assenting to the *dictum* of Judge Wagner, in *State* v. *Miller*, 50 Mo. 133, that "the continuance of a lottery is doubt- less an evil, but its abolishment by throwing down the legal barriers which have been built up for the protection of the citizen and his property would be a still greater evil."

It has been urged upon the court that a supposed " public policy" requires that the laws of property and individual rights should be made to bend in this. As a judge, I ener- getically repudiate such an idea. Public policy is repre- sented to me only by the laws, which I sit to interpret, and not to make. The suggestion, " to do a great right, do a little wrong," is an evil one, and as contrary to good law as to sound morals.

The new contract of April, 1849, between the trustees of New Franklin and Walter Gregory, is sealed with the seals of the trustees, and recorded on the records kept by the trustees, in the form of an ordinance. The court below

admitted a certified copy, or what purported to be a certified copy, of this contract, against the objections of the State. I see no force in the objections urged to its admission, but it is. not necessary to set them out, as it was admitted, and the prevailing party cannot in this court. object to the ruling of the court admitting evidence. The agreement is as follows: "This agreement, made and. entered into this 11th day of April, 1849, by and between the board of trustees of the town of New Franklin, at a. called meeting of said board on the date hereof, and Walter Gregory, witnesseth that the said board have resolved that. for and in consideration of the sum of $500, paid by said Walter Gregory on the day of the date hereof, in addition to the sum of $1,000 paid on the contract dated on 1st of June, 1842, the said Gregory is hereby released and discharged from all further payments under and by virtue of said contract until July 15, 1851, but from said 15th July, 1851, the semi-annual installments of $250 to commence and continue, according to the terms and tenor of said contract, until the further sum of $13,400 is fully paid, making the full sum of $15,000, as contemplated in the act of the Legislature of Missouri, to which said contract is referred, is. raised."

It is said that this contract of 1849 is void as being a nude pact, and that, not being a contract, for want of consideration, it is not within the language of the act of 1855, and is not ratified thereby. In any other case but this it might be considered hair-splitting to argue that an instrument purporting to be a contract, but not really so for want of consideration, does not come within the scope of a validating act referring generally to "all contracts." I hold that there is nothing whatever in the argument, for three reasons:

1. That, even if this were not, strictly speaking, a contract, because not a legal or valid one, still it would be ratified by the act of December, 1855, since it would be absurd to suppose that that act was passed to validate con-

tracts believed by the Legislature to be valid contracts without it.

2. That consideration is not of the essence of a contract, though it is necessary to support one; and,

3. That a contract under seal, as this is, needs no consideration whatever, and is perfectly binding between the parties, not only without a consideration named, but even when the consideration, as in this case, is set out and appears to be no consideration at all, because a consideration already past.

As this contract of 1849 is the key-stone to the arch, and the right to run the lottery at this time depends wholly upon the question whether it can stand or not, I pause to support the propositions just laid down.

A contract or agreement is *where a promise is made on one side and assented to on the other*. This is a strictly accurate definition. It includes nothing which can be left out, and excludes nothing which is essential to the thing defined. Blackstone defines a contract " an agreement, upon sufficient consideration, to do or not to do a particular thing;" and this, perhaps, might serve as an example, in a text-book on logic, of a bad definition, independently of the objection that the word *agreement* requires to be defined as much as *contract* does. The existence of a consideration, though no doubt necessary to *support* a contract—that is, to give it validity, so that it can be enforced by the courts—forms, properly, no part of the idea—of the essence—of the thing, and should be rejected from its definition. We constantly consider and speak of the contract itself as something distinct from the consideration. Blackstone's definition has a third fault: It excludes an essential element of a contract—that which properly distinguishes a contract from a promise—its mutuality.

The contract of 1849 is a *deed*, not a *simple contract*. The legal efficacy of a deed will not be prevented by the mere want of consideration. For in this respect deeds

are distinguished from simple contracts, to the validity of which some consideration is essential; but a writing sealed and delivered is supposed by the law to be made with due deliberation, and to express fully and absolutely the intention of the party by whom it is executed. He is, therefore, bound by its execution, whether he received a consideration for the grant or consideration which it comprises, or not. This is perfectly well-settled law. Bac. Read. Uses, 79; *Bunn* v. *Gray*, 4 East, 200; *Irons* v. *Smallpiece*, 1 Barn. & Ald. 554; *Pratt* v. *Barker*, 4 Russ. 507. It will not do to say the reason of this law has ceased. In the first place, I do not concede that, for I think it well to have some solemn form of contract which, except in case of fraud, shall absolutely bind, and from which parties shall not be allowed even to attempt to resile; and, in the second place, on the faith of this well-settled law, parties do now, every day, contract. It is on the *certainty* of the law that our peaceful holding of our possessions rests.

When it is said, then, that this contract is void, being a naked pact, it is sufficient answer to say that this is a specialty, a deed, a contract under seal, and not a simple contract, and, therefore, needs no consideratien for its support. Smith Con. 81. Persons may, if they will, contract a gratuitous obligation by deed. Id. 86. Had it been a simple contract, however, and not valid for want of consideration, it would have come strictly within the definition of a contract, though one which the law would not enforce. There is the meeting of two minds—the request on one side and assent on the other—which are the essence of a contract. *Jackson* v. *Galloway*, 5 Bing. N. C. 75; 2 Steph. Com. 109, note; Smith Con. 89, note. It is, therefore, within the language of the act of December 6, 1855, which provides that "all contracts made by the trustees of the town of New Franklin, for the purpose of raising the amount of money authorized to be raised by the said act of incorporation and the said act amendatory thereof, be, and

the same are hereby, declared to be legal, and may be carried out according to the true intent and meaning of the parties thereto."

It is said that the contract of 1849 was void because there existed, at the time of its execution, a general law of the State prohibiting lotteries. Such a law was enacted in 1836, and was in force also when the contract of 1842 was made, but this lottery was exempted from its operation. The same power which passed the general lottery act of December 19, 1842, by ratifying the contract of 1849 repealed its provisions so far as the Missouri lottery was concerned. It certainly had the power to do so. The same legislative power which prohibited lotteries in 1842 and 1845 could repeal these laws and permit sales of tickets in 1855.

It is, however, urged that, in view of acts passed against lotteries in 1842 and 1845, the trustees of New Franklin had no power in 1849 to make any contracts extending the time of drawing the New Franklin lottery. To this the answer is made that the act of 1855 ratifies and makes good this action of the trustees, and that the subsequent ratification is equivalent to a previous grant; and it is replied on the part of the State that such attempted ratification is in violation of the constitutional provision then in force in this State, that " no law retrospective in its operation shall be passed." The Legislature undoubtedly could not pass a law changing a contract between individuals, making good a void deed, or making that a man's will which, being informally executed, was not his will in the eyes of the law at the time of the death of the testator ; but the Legislature unquestionably could, and can, validate, with the consent of the other party to the contract, the irregular acts of the authorities of one of the counties or municipal corporations of the State. The State, in the matter of the modification of the contract of 1842, even if its modification by the contract of April 11, 1849, was in excess of the powers of the trustees of New Franklin, might well say : This is my

contract, made through my agencies, and I ratify it. This has been decided in this State. Such laws have been passed again and again, and the Supreme Court has decided that they were not retrospective in the sense of the Constitution. *State of Missouri* v. *Barton County* The act of 1868, validating the void bonds of the county of Franklin, was held to be perfectly good, and a valid curative act.

There was no constitutional provision against lotteries in this State until 1865. If, then, the contract of 1849 was valid when made, or was in 1855 made valid by the Legislature, no subsequent constitutional ordinance, no law, no decision by any court whatever, could afterwards in the slightest degree impair its validity, and it is perfectly valid now. *State* v. *Miller*, 50 Mo. 133.

It may be said that the legislation on this subject was imprudent—that the grant to the town of New Franklin was rash and unwise; but, if it was done, the courts cannot undo it. The learned judge who tried the cause below, in his written opinion, asks: "Can it be possible that a franchise granted to raise $15,000 for a charity can be transferred into an immense private income, affording but a pittance to the charity?" He answers that it cannot be. But, unfortunately, it seems that it is; and why not, if the Legislature gives to the grantees a right to sell the franchise and they make a foolish bargain, or if the bargain turns out better for the purchaser than at the time it was believed it would? The learned counsel who appeared for the State, in *State* v. *Morrow*, 26 Mo. 140, in his brief, also asks, in regard to this transaction: "What is there to prevent the trustees from agreeing to receive one dollar a year, and legalizing the lottery for 15,000 years?" Nothing whatever, I suppose, if the Legislature empowered them to do so, and there was no constitutional provision against it. And, as Judge Scott says in that case (1857): "The General Assembly having by a late law ratified the contract made by the trustees for

the disposition óf the lottery, this cannot be a matter of much importance."

The present defendants are, as appears by the record in this case, by *mesne* conveyances, the assignees of Gregory, who died twenty years ago. It is to be presumed that they paid full value for the franchise which the Legislature and the courts authorized him to sell. But that concerns us not at all.

The rule of property seems to me to have been fully established when they bought, and they, doubtless, at the time of the purchase, confidently relied upon the laws of their country for the protection of their legal rights. This is not a matter of sentiment, but a plain question of right and wrong; and to disturb defendants because they are making a fortune out of the lottery is what no legal power on earth can do.

The learned judge below admitted evidence to show that the trustees of New Franklin misapplied the funds received by them from the lottery. He held this to have been a forfeiture of the franchise, and gave judgment of ouster. A forfeiture of what franchise? Judgment of ouster against whom? The trustees of New Franklin, under the authority of the State, sold their right to run a lottery. The law which gave them this lottery privilege gave them express power to do so. How could they forfeit a franchise which they had sold? Before they sold it, the Legislature could have taken it away, because it was a pure gratuity, but after they had, by authority of the Legislature, sold it, their assignees for value were in a very different position. It was a matter of contract, and the legislature was powerless to impair the obligation. The learned judge below says: " The franchise being a contract, the Gregory contract is ingrafted on it, and thus we have one franchise." But the original grant of the franchise was clearly no contract, and the Legislature could have abolished the town and all its

franchises, this among them, at any time before a sale. It can, for that matter, abolish the town to-morrow. The creator can destroy, at will, its own creature, yet the lottery privilege, sold by its permission more than thirty years ago, would remain unimpaired. Is it supposed that the Legislature gave to the town of New Franklin a right to sell a lottery privilege revocable at the legislative will? Who would buy such a right? What would it be worth?

It is a mistake to say that these franchises of the right to run the town and the right to run the lottery are an entirety. They can be separated. Where several franchises are granted by one charter, forfeiture of one does not forfeit the others (Tancrede, Quo. War. 257), and a court would refuse to forfeit the municipal franchise of the town of New Franklin for violation of its provision by the trustees. These franchises are for the benefit of the people, not of the trustees. High on Rem., sec. 680. But any inhabitant of the town could, at any time, have compelled these trustees to appropriate the receipts of the lottery in accordance with the law. Over this matter, however, Gregory and his assignees had no control; and, in my judgment, it was error to admit, in a proceeding of this character against the assignees of Gregory, any evidence either as to the receipts of the lottery or the misappropriation of the fund paid to the town of New Franklin. This was done against the objections of appellant, and the points were duly saved. I cannot, therefore, concur with the majority of the court in sustaining the judgment of ouster.

I concur, however, in thinking that the Circuit Court has jurisdiction of an *ex-officio* information in the nature of a *quo warranto*. I do not think the statute on the subject has the effect of limiting the common-law jurisdiction of the Circuit Court in this respect.

Because the statute makes it imperative on the attorney general or circuit attorney, under certain circumstances, to exhibit in the Circuit Court an information *ex relatione*, I

do not see that it at all follows that he cannot do so *ex officio*, and I do not believe that the law was meant to limit the jurisdiction of the Circuit Court in the matter. The question has never been directly presented for decision in the Supreme Court; but, in *State*, ex rel. v. *Cape Girardeau Railroad Company*, 48 Mo. 468, the circuit attorney *ex officio* appears to be the relator, and the jurisdiction of the Circuit Court is not questioned at all. The writ of *quo warranto* had fallen into disuse so long before the time of Coke that he could not determine when the justices in eyre ceased, and with them the writ that was used only during the continuance of that institution; but, long before James I., informations in the nature of *quo warranto* were in use, and the practice was adopted into this State with the common law of England. The writ, after the circuits of the justices in eyre ceased (which was at some uncertain period after Richard II., and before the Tudors), became returnable before the King's Bench and the other courts at Westminster. The statute of Anne (9 Anne, ch. 20) was passed to give the remedy full effect in England, and provides that it shall be lawful for the proper officer, with leave, to exhibit an information *quo warranto* at the relation of any person desiring it, who shall be named therein and be responsible for costs, etc. I do not think that our statute was any more intended to oust the jurisdiction of the Circuit Court than was the statute of Anne to oust that of the King's Bench; neither statute confers upon the court its jurisdiction, nor is either statute intended to define or limit it. As the King's Bench has jurisdiction of an information in the nature of a *quo warranto*, without other relator than the attorney general, so has our Circuit Court.

But, for the reasons stated above, its judgment in this case should, in my opinion, be reversed and judgment entered for the appellant in this court.