THE STATE ex rel. I. B. KIMBRELL, Prosecuting Attorney, v. PEOPLE'S ICE, STORAGE AND FUEL COMPANY et al., Appellants.

Division One, November 30, 1912.

1. **REFERENCE: Exceptions: Bill Must be Filed During Term: Objections Before Referee.** The action of the circuit court in referring a case is not for review on appeal where no term bill of exceptions was filed or leave taken during the term at which the reference was made. A recital in a bill filed by leave given at a later term does not save the point, and neither do objections made before the referee when the taking of testimony began. The referee could not set aside his own appointment.

2. **———: Objections after Referee's Report.** After the report of a referee is in, it is too late to object to the reference of the case on the ground that the case was not referable and consent had not been given.

3. **———: ———: Motion for Jury Trial Made too Late.** Where the trial court referred the issues at the relator's instance without exception taken, it was too late, after the referee's report was filed, for defendants to move for trial by jury.

State ex rel. v. People's Ice Co.

4. **CHANGE OF VENUE: Bias and Prejudice of Judge: Application Made too Late.** The trial court's ruling refusing a change of venue for bias and prejudice of the judge, cannot be disturbed where the applicant presented his application after a referee's report had been filed and exceptions argued, submitted and sustained, and at eleven o'clock a. m. of the same day on which he had already filed two motions in the case which were overruled.

5. **THEORY OF TRIAL: Governs Appeal: Quo Warranto: Information: Prayer for Injunction.** Where a case was tried below and heard in the Supreme Court upon the theory that it is purely a proceeding by information in the nature of *quo warranto*, it must be decided on that theory in the Supreme Court, despite the presence in the information of a prayer for an injunction.

6. **REFERENCE: Findings Set Aside by Trial Court: Appeal: Evidence: Province of Appellate Court.** Where a reference, which must be treated by the Supreme Court as properly made by compulsion, was made in an action in the nature of *quo warranto*, to which the rules of equity do not apply, the trial court's action in setting aside the referee's report and making new findings of fact, after admitting certain evidence excluded by the referee, will not be overturned by the Supreme Court on the ground that there was substantial evidence in the record supporting the findings of the referee.

7. **AGREEMENT IN RESTRAINT OF TRADE: Evidence: Admissibility: Quo Warranto: Information.** Although the information in an action in the nature of *quo warranto* based upon an alleged illegal combination in restraint of trade alleges that the defendant People's Ice, Storage and Fuel Company was organized July 1, 1905, and that prior to that time the other defendants were competing in business, nevertheless, since the said People's Ice, Storage and Fuel Company when organized merely succeeded to the assets and tendencies of another corporation, evidence is competent as to the purposes of the organization of its predecessor and as to the relation between that predecessor and other defendants prior to July 1, 1905. The allegation in the information is not that there was competition at all times prior to July 1, 1905, and the Supreme Court cannot give it such a construction after judgment, to overthrow findings based upon a contrary construction fully warranted by the language. The ultimate question is whether or not such illegal combination existed at any time covered by the charge in the information, and to prove this the court may go back to the very first step in its concoction.

8. **————: ————: Corporation Succeeding to Business of Another.** Several dealers in ice formed a combination in restraint of trade, the purposes of which were effectuated through a dis-

tributing corporation whose stock was owned by the dealers in question. The Ferd Heim Brewing Company was one of those dealers, and, subsequently, after the organization of a new distributing corporation which took the place of the old one, the assets of that brewing company were purchased by the Kansas City Breweries Company. The same man was the president of the old and the new brewing company and held for both breweries the stock of both ice distributing corporations. *Held*, in an action in the nature of *quo warranto*, that the finding of the trial court against the Kansas City Breweries Company as a participant in the illegal combination was warranted.

9. ————: ————: **Declarations of President of Corporation.** Where there is ample proof of a conspiracy in restraint of trade, as well as that the Central Ice Company, one of the defendants in this action in the nature of *quo warranto*, became a party thereto, the declarations of that corporation's president in furtherance of the object of the combination were admissible and competent evidence.

10. ————: **What Is: Sale of Ice.** Where the evidence in a proceeding in *quo warranto* against certain corporations dealing in ice, charged with forming an illegal combination in restraint of trade, discloses that the contracts of these corporations with the distributing corporation called for practically all of their output during the ice season—June 15 to September 15 of each year—the defendants are not helped by the fact that they made sales to others, chiefly during the spring and fall months and in quarters having no tendency to affect the increased rate made by the distributing corporation.

11. ————: **Various Contracts Considered as Parts of a Whole.** In arriving at a conclusion whether or not an illegal combination in restraint of trade exists, the various arrangements and contracts in evidence are not to be construed independently, but reference must be had to evidence which indicates that those transactions were mere parts of a whole which constituted an illegal combination.

12. ————: **Anti-Trust Statute: Construction: Provinces of Courts and Legislature.** The anti-trust statute of Missouri condemns every direct restraint of trade, great or small. It closes the only door through which doubts as to its construction could enter, by positively prohibiting defined combinations without regard to what the courts may think as to the extent of their effects. The Legislature saw fit to ordain "that competition and not combination" should obtain in business in the State. As long as it moves in its constitutional orbit the judgment of the Legislature is final and the wisdom of its enactments is not open to question in the courts.

13. ———: **Contracts Expired: Cancellation: Moot Question.**
Where certain contracts involved in this action in the nature of
*quo warranto* charging a combination in restraint of trade have
since expired by their own limitations, the question whether the
trial court erred in ordering their cancellation becomes a moot
one and it will not be considered by the Supreme Court.

14. ———: **Quo Warranto: Evidence: Findings of a Trial Court:
Appeal.** *Held*, in an action in the nature of *quo warranto* charg-
ing a combination in restraint of trade, that there was abundant
evidence to warrant the findings made by the trial court.

Appeal from Jackson Circuit Court.—*Hon. Walter A.
Powell,* Judge.

AFFIRMED.

*Warner, Dean, McLeod & Timmonds, Cowherd,
Ingraham, Durham & Morse* and *Clinton A. Welsh*
for appellants.

(1) The court committed error in overruling the
application of People's Ice, Storage & Fuel Company
for change of venue. Corpenny v. Sedalia, 57 Mo. 88;
Mix v. Kepner, 81 Mo. 93; Dowling v. Allen, 88 Mo.
293. The serving of the notice on the prosecuting
attorney in open court, and the immediate filing of the
application and notice was sufficient. Douglas v.
White, 134 Mo. 228. The statute requiring the court
to grant change of venue is mandatory. R. S. 1899,
sec. 822; Gee v. Railroad, 140 Mo. 314. (2) The find-
ings of the commissioner are still presumed to be cor-
rect, notwithstanding their disapproval by the lower
court. Henderson's Chancery Practice, 146. Excep-
tions to his report must be to his findings, and not to
the reasons given in support of the findings. The ob-
ject of referring a case to a commissioner is not to
give a party two trials instead of one. The power of
the court to rehear the case, after report of the com-
missioner is undeniable; but that power is not exer-
cised except for good cause; and mere differences of

opinion between the commissioner and court as to the weight of the evidence is not such good cause. To review the decision of the commissioner upon a question of fact, would be a rehearing of it upon, in effect, an appeal; and more, it would be allowing the party to come back to the court for the trial of a question voluntarily taken from the court to the commissioner. Such a course is not according to the well settled practice in such cases. Every presumption is in favor of the findings of the commissioner. In Pennsylvania the same degree of weight is given to the findings of the commissioner as to the findings of a chancellor who hears the case in open court. Steinmeyer v. Siebert, 190 Pa. St. 471. In Missouri the same degree of weight is attached to the findings of a commissioner or referee as to a special verdict of a jury. Bogt v. Butler, 105 Mo. 479; Ferry Co. v. Railroad, 73 Mo. 389; Lingenfelder v. Wainwright, 103 Mo. 578. Where a case is referred to a commissioner upon the request or motion of a party (as was done here on motion of the prosecuting attorney over the objections of the defendants) and the findings are against him, such findings are given greater weight than in cases where the reference is not consented to, and are equivalent to the special verdict of a jury, or the findings of the trial court. Davis v. Schwartz, 155 U. S. 651; Kimberly v. Arms, 129 U. S. 512; Furrer v. Ferris, 145 U. S. 132; Brotherton v. Reynolds, 164 Pa. St. 134. And the appellate court will not hesitate to set aside the order of the lower court and sustain the findings of the commissioner if justice seems to require it. Henderson's Equity Practice, 843; Mirkil v. Morgan, 134 Pa. St. 144; McGee v. Johnson, 87 Ill. App. 475; Heard v. Russell, 59 Ga. 25. So the Supreme Court will deal with and treat the findings of commissioner Flournoy just as it would have done if his report had been made to it in the first instance, and his findings will not be disturbed. (3) All ice contracts of People's

Ice, Storage & Fuel Company were legitimate. United States v. Am. Naval Stores, 172 Fed. 455; Standard Oil Case, 173 Fed. 177; Standard Oil Case, 177 Mo. 378. (4) There was no agreement or understanding to limit the output or to fix the prices of ice. (5) Uniformity of market prices as a suspicious circumstance. The commissioner saw and heard the witnesses who testified touching the matter of uniformity of prices, the reasonableness thereof, and that there was no agreement or understanding, expressed or implied, secret or otherwise, to regulate, control, or fix the same, and he believed they told the truth; and he very properly and judicially recognized that principle of the law which will not impute a bad motive where a good one can as well be assigned. Ames v. Gilmore, 59 Mo. 543; Trust Co. v. Brown, 117 Mo. 412. (6) The market prices of ice in Kansas City were reasonable. (7) The ice market was open to all and competition therein free and untrammeled. (8) People's Ice, Storage & Fuel Company is not an illegal monopoly. U. S. v. Am. Naval Stores, 172 Fed. 455. (9) The court committed error in depriving defendant of its constitutional right of trial by jury. The weight of authority is in favor of the proposition that, at the common law, an information in the nature of *quo warranto* was triable by jury. Paine on Elections, sec. 903; Wood, Mandamus & Quo Warranto, p. 234; High on Extraordinary Legal Remedies, secs. 740, 741. (10) To sustain this judgment as to the K. C. Breweries Co., it must appear, from the legal, competent evidence in the record, that in doing the things it did, it was actuated by a purpose and design to violate the law. State v. Tobacco Co., 177 Mo. 1; Robinson v. Dryden, 118 Mo. 534· Thrasher v. Green Co., 105 Mo. 254; Webb v. Darby, 94 Mo. 621; Hayward v. Ins. Co., 52 Mo. 192; Johnston v. Shortridge, 93 Mo. 231. (11) Knowledge to an officer of a corporation. In order to bind a corporation with notice to its agent or knowl-

edge coming to an officer or agent of a corporation it must be shown that the notice or knowledge came to such officer or agent of the corporation within the range of his official duties while transacting business for such company. The Supreme Court of this State has laid down the following rule on this subject: "The law is well settled in this State that knowledge which comes to an officer of a corporation through his private transactions, and beyond the range of his official duties is not notice to the corporation. This is the rule, though the officer obtaining the knowledge was at the time the managing agent of the corporation." Bank v. Froman, 129 Mo. 430; Smoot v. Judd, 148 Mo. 583; Bank v. Thompson, 118 Fed. 800.

*Isaac B. Kimbrell* and *Clyde Taylor* for respondent.

(1) The statute, so far as applicable to the situation here, is as follows: "Any corporation which shall become a party to any understanding with any other corporation or association to regulate or fix the price of any article of manufacture, . . . or to maintain said price when so regulated or fixed, or shall become a member of any combination to fix or limit the amount of any article of manufacture, shall be deemed guilty of a conspiracy to defraud." R. S. 1899, Sec. 8965. (2) "A conspiracy may be proven both by acts and circumstances." State v. Walker, 98 Mo. 104. "A pool may be as conclusively proven by facts and circumstances as by direct written evidence, for in this regard they are like all other frauds." State ex rel. v. Ins. Co., 152 Mo. 41. "A conspiracy may be proven by circumstances and by the acts and declarations of the parties engaged in the common design." 3 Greenleaf on Evidence, sec. 93. "Giving notice of uniform advance in rates on certain dates, always followed by such raise, are such acts and circumstances as certainly

tell a strong and conclusive tale of wrongdoing."
State ex rel. v. Packing Co., 173 Mo. 385. The old
Distributing Company was organized for the avowed
purpose of destroying competition. Its contracts
were made with that end in view. The new company
took up and carried out the unexpired contracts of the
old company. The new Storage Company entered
into renewal contracts of the same kind, made in pur-
suance of the original combination by the old Dis-
tributing Company with the manufacturing companies.
The new company, so far as stockholders, manage-
ment, purpose of organization and maintenance is con-
cerned, is but the old company with the simple addi-
tion of the word "storage" to its name. Everything
the old company did, every contract it made, is ad-
missible in evidence against the new company, because
the new company entered into the designs of the old
company and carried out the purposes of the old com-
pany. Harding v. Glucose Co., 182 Ill. 632; McDaniel
v. Harvey, 51 Mo. App. 198; Slattery v. Transporta-
tion Co., 91 Mo. 217. "Where a number of milk deal-
ers agreed between themselves to organize a corpora-
tion and become its stockholders for the purpose of
controlling the price and sale of milk to retail deal-
ers, the corporation itself is a trust." Ford v. Associ-
ation, 155 Ill. 166; Distilling Co. v. People, 156 Ill.
490. (3) The court was not precluded from entering
a just judgment upon the facts proven by the report
of the commissioner. Heating Co. v. Bissell, 41 Mo.
App. 426; Bank v. Miller, 73 Mo. 187; O'Neill v. Cop-
pell, 62 Mo. 202; Bissell v. Warde, 129 Mo. 439; Lin-
genfeller v. Brewing Co., 103 Mo. 578. (4) If there
was a question about the right of a court in a case of
this nature to appoint a commissioner to hear and
report testimony, appellants are not in position to
insist upon that point in this case. The appointment
was made at the June term of the court. The report
was made at the following term. The judgment of

the court was entered at a still later term. No exception was saved to the ruling of the court for the appointment of the commissioner at the June term, 1906. Such was necessary to save their point, if there was any merit in it. Pace v. Roberts, 103 Mo. App. 662; Barber & Co. v. Ullman, 137 Mo. 543; Richardson v. Association, 156 Mo. 407; Reineman v. Larkin, 222 Mo. 156.

BLAIR, C.—This is a proceeding by information in the nature of *quo warranto* instituted by the prosecuting attorney of Jackson county, on his own relation and in his official capacity, against the People's Ice, Storage & Fuel Company, Vanderslice-Lynds Mercantile Company, Central Ice Company, Western Ice & Cold Storage Company, Kansas City Breweries Company, Dold Packing Company, John J. Ruddy and Thomas P. Ruddy. The Ruddys are alleged to be partners doing business under the firm name of Ruddy Brothers and also under the name of the Inter-State Ice & Cold Storage Company. Excepting the Jacob Dold Packing Company, the other corporate defendants are Missouri corporations. The Jacob Dold Packing Company is a corporation but it is not alleged in what State it was organized. The circuit court found for the defendants Jacob Dold Packing Company, Western Ice & Cold Storage Company, John J. Ruddy and Thomas P. Ruddy, but entered judgment against the other defendants, assessing a fine of $5000 against the Central Ice Company, a fine of $4500 against Vanderslice-Lynds Mercantile Company, a fine of $5000 against the Kansas City Breweries Company, a fine of $15,000 against the People's Ice, Storage & Fuel Company and also entered judgment forfeiting the charter of the last named company. From that judgment all four convicted defendants appealed.

The information alleged, in substance, that prior to July 1, 1905, the defendants, excepting the People's

Ice, Storage & Fuel Company, manufactured and sold ninety per cent of the ice used in Kansas City, Missouri, and vicinity; that the People's Ice, Storage & Fuel Company, a corporation with a capital stock of $170,000, was organized under the laws of Missouri by stockholders of the other defendants, the stock being held in trust for their respective corporations by the stockholders mentioned; that subsequently the other defendants, excepting the Central Ice Company, agreed with each other and the People's Ice, Storage & Fuel Company that for a period of three years each would sell to the latter for about cost the ice it manufactured, excepting such ice as it used in its own business other than the ice business; that said contracts were in force and being complied with, together with further agreements that none of such defendants would sell to another than the People's Ice, Storage & Fuel Company nor produce more ice in excess of its own needs than required by contract with the last mentioned company, though the plants of the respective defendants had sufficient capacity to produce much more; that the Central Ice Company agreed with the other defendants to conform to a scale of prices to be agreed upon from time to time. It is further alleged that defendants were and had been complying with all these contracts and agreements; that the profits of the People's Ice, Storage & Fuel Company have been and hereafter will be divided among the other defendants having the beneficial interest in the stock of the company named.

It is then alleged that defendants and other unknown persons, corporations and copartnerships constitute an unlawful trust and combination for the purpose and with the effect of lessening and destroying competition in the manufacture and sale of ice and of creating a monopoly in the ice business in Kansas City and vicinity.

246 Mo.—12

The People's Ice, Storage & Fuel Company, and the Vanderslice-Lynds Mercantile Company filed practically identical returns, denying specifically the several allegations of the information except that each admitted the fact of its incorporation as charged and the fact that it was engaged in the manufacture and sale of ice in Kansas City and vicinity. Each of these returns averred that there was full and free competition in the ice business in Kansas City, and each contained a paragraph challenging· the authority of the prosecuting attorney to institute the proceeding.

The Kansas City Breweries Company in its return admitted its incorporation but denied that it was incorporated prior to July 1, 1905, or engaged in the ice business prior to that time and denied it was ever engaged in the ice business in Kansas City in competition with the other defendants named or any of them; admitted its ownership of a portion of the capital stock of the People's Ice, Storage & Fuel Company but denied it owned such stock July 1, 1905, or that it was directly interested or participated in the formation of the last mentioned corporation and specifically denied all other allegations of the petition.

The Central Ice Company filed what it termed a motion to dismiss as to it, wherein it denied the allegations of the information affecting it and set forth several pages of correspondence and other evidence of its efforts to furnish ice for the Kansas City market, coupling with this a protest that the pendency of this proceeding will injure its credit. To this were added the affidavits of several officers and employees· of the Central Ice Company as to the truth of the facts set up in the motion and as to the company's having manufactured all the ice it could. This conglomeration was treated by the trial court as a return and, shorn of its objectionable features, it will be so treated here.

The returns of the other defendants do not appear in the abstract and are not important in view of the judgment entered.

The cause was referred to a commissioner who heard evidence for several weeks, and, in his report, recommended judgment for all the defendants. On exception filed by the prosecuting attorney the court set aside the referee's findings and, on the evidence reported by the referee, rendered judgment as before indicated, and also requiring the cancellation of certain contracts, to which reference will be made hereafter. Motions for new trial and in arrest of judgment were filed and overruled and the four defendants found guilty appealed.

The findings of the referee were based on that part of the evidence which remained after the exclusion of all evidence relating to transactions occurring prior to July 1, 1905, the date of the organization of the People's Ice, Storage & Fuel Company. The trial court, in making its findings, took this excluded evidence into consideration.

The evidence disclosed that the People's Ice, Storage & Fuel Company, capital stock $170,000, was organized about July 1, 1905, and that it took over the assets and assumed the liabilities of the People's Ice & Fuel Company. This last named company was incorporated in 1898. At that time (1898) the Armour Packing Company, The Ferd Heim Brewing Company, The Vanderslice-Lynds Mercantile Company, The Kansas City Ice & Cold Storage Company, The Grand Avenue Ice Company, The Woods Ice Company, The Yates Ice Company, The Fowler Packing Company, The Jacob Dold Packing Company and the Standard Ice & Coal Company were in the ice business in Kansas City. The Woods Ice Company and the Yates Ice Company stored and sold natural ice. These seem to have been merely names under which R. W. Woods and James Yates, respectively, carried on the ice busi-

ness.    The Standard Ice & Coal Company was in the
ice distributing business.    The others were manufac-
turers of ice, some of them also distributing ice with
their own wagons and teams or selling to peddlers
(persons operating one or more ice wagons of their
own) who were engaged solely in the distributing or
retail branch of the business.    There may have been
other manufacturers of ice and dealers in natural ice
in the city at that time, but if so, their output was
insignificant compared with the total output of the
companies named.    At the time mentioned (1898) the
competition in Kansas City in the ice business was so
great that the wholesale price to peddlers had been
cut to one dollar per ton, a sum scarcely sufficient
to pay the expense of production of manufactured
ice—which constituted the bulk of the supply on the
Kansas City market.    This, the evidence indicates,
was due to competition among the packing and other
companies, such as the Brewing Company and The
Armour Packing Company, each of which consumed
large quantities of ice in its own business and ordi-
narily produced quantities much in excess of its daily
needs by reason of the fact that its plant was equipped
with ice-making machines of greater daily capacity
than the needs of the company made necessary in order
to guard against the loss which would follow in its
principal business in case its ice plant became tempo-
rarily or partially disabled.    For this reason these
companies, or some of them, maintained double plants
and operated both, since to allow either part of the
plant to lie idle was more expensive, on account of
deterioration and loss of interest, than to operate the
two and put the excess ice, thus produced, on the mar-
ket.    In 1898 the Standard Ice & Coal Company, which
produced no ice but had contracted for the output of a
plant on Grand Avenue and owned some natural ice,
was, as stated, in the business of selling ice, solely,
operating about thirty wagons.    N. H. Trask, Thomas

Manville, George Manville, Hugo Clossen or Claussen and Kenneth Hudson owned all the stock of the Standard Ice & Coal Company. This company having no other business during the warm months than the sale of ice, was among the first to feel the effects of the low prices which the competitive conditions mentioned produced. The gentlemen named conceived the idea of relieving (from their point of view) these conditions by the organization of a distributing company, the stock to be divided among the principal ice producing and selling companies in the city in proportion to the sales made by the respective companies during the preceding year. To accomplish this end Trask "interviewed different ice men." Kirk Armour, of the Armour Packing Company, was the first man approached. W. D. Miles, then the manager of the Armour Plant, was also present at a conversation with Trask and Thomas Manville in Mr. Armour's private office and the statistics of the ice business the previous year were put before him. According to Trask, and the fact was not denied by Miles, the latter was "invited into the room where we were and told to help form the organization and do all he could." Having proceeded thus far the learned commissioner excluded the details of the conversations with Armour and Miles, because Armour was dead and Miles (the commissioner held) not in a position to bind any defendant in this case. It may be noted here that the Armour Packing Company is not a party to this proceeding. Joseph J. Heim, then of the Ferd Heim Brewing Company and at the time of trial president of the Kansas City Breweries Company, was the next man before whom the plan was laid and he, while doubting the feasibility of the plan, agreed to "enter that kind of a deal if the rest would do it." Trask next talked about the matter with O. W. Butt and A. Menny of the Kansas City Ice & Cold Storage Company, the commissioner excluding the details of the

conversation. Mr. Vanderslice, of Vanderslice-Lynds Mercantile Company, was next interviewed and the plan presented to him.

The plan was to organize a central distributing company which should contract to buy the ice of the companies entering into the scheme at a price to be determined by subsequent agreement, an amount of stock to be taken by each participating company equal to the proportion the ice sold by such company the preceding year bore to the whole amount sold during that year by all the companies participating in the organization. The capital stock was to be $20,000. The purposes were to stop the cutting of prices and lessen the expense of delivering ice and "to eliminate unreasonable competition." Mr. Vanderslice said that the purpose of his company was to "get out of the distribution of ice" because it had proved unprofitable. Several meetings were held. One was attended by R. W. Wood of the Wood Ice Company, James Yates, of the Yates Ice Company, Mr. Butt, of the Kansas City Ice & Cold Storage Company, W. D. Miles, representing the Armours, and Trask, Clossen and Thomas Manville, of the Standard Ice & Coal Company. The witness also thought Mr. Heim was present. At other meetings Mr. Rittick or Reddick represented the Grand Avenue Ice Company, Vanderslice represented the Vanderslice-Lynds Mercantile Company, Yates, Woods and Joseph Heim, representing their respective companies, W. D. Miles representing Armours and Mr. Butt and Mr. Menny representing the Kansas City Ice & Cold Storage Company. At the meetings mentioned there was a general discussion of the proposed plan and its purposes. It was finally agreed that a distributing company be organized for the purposes of putting an end to "unreasonable competition," stopping price cutting and lessening the expense of distribution. The Vanderslice-Lynds Mercantile Company, the Ferd Heim Brewing Company,

The Armour Packing Company, The Kansas City Ice & Cold Storage Company, The Grand Avenue Ice Company, The Yates Ice Company and The Woods Ice Company united in the formation of the new company. Whether others participated is not quite clear. The stock was not issued directly to the corporations entering into the arrangement but to individuals who held it for the several corporations. Joseph Heim, H. Vanderslice, A. Menny, O. W. Butt, W. D. Miles and J. S. Thayer, Mr. Rittick or Reddick, Captain Woods and James Yates were the principal stockholders and incorporators of the People's Ice & Fuel Company in 1898. Four or five of the companies participating in the organization distributed as well as manufactured and imported ice, and the wagons, teams and other equipment used by these companies in distributing ice were turned over to the new company, about seventy-five per cent of the stock being paid for in this fashion, according to Mr. Heim. By this means the companies engaged therein were taken out of the retail business and the routes which had known them theretofore as competitors knew them no more. The company thus formed entered into contracts with the several companies which held its capital stock (owned the beneficial interest therein) whereby it agreed to take large quantities of ice from these companies. The price to be paid by the company to all was, after some discussion, fixed by agreement of the representatives of the stockholders at two dollars per ton. The name decided upon for the company was the People's Ice & Fuel Company. Other contracts were made with other persons and outside companies for ice as it seemed to be needed and was obtainable.

There were some changes in the stockholdings as time progressed. The first one of importance was the sale of some stock to J. C. Dold, immediately followed by a contract for the most of the output of the Dold Packing Company ice plant at two dollars per ton, the

price paid companies which originally took part in the organization. Yates sold part of his stock to A. Menny, then manager of the People's Company, a part, probably, to W. S. Pontius, connected with the same company, and part to O. W. Butt, and the stock of the Kansas City Ice & Cold Storage Company passed subsequently into the hands of the National Bank of Commerce and then to The Western Ice & Storage Company, organized by the bank mentioned to take over the Kansas City Ice & Cold Storage Company plant and its stock in the People's Ice & Fuel Company. The stock which had been held for the Armour Packing Company by J. S. Thayer was sold or transferred to W. D. Miles, who held or had held other shares for the same company.

In June, 1905, and for some time prior thereto, the stock of the People's Ice & Fuel Company stood in the names of H. Vanderslice of Vanderslice-Lynds Mercantile Company, J. J. Heim of the Ferd Heim Brewing Company, W. H. Winants of the Western Ice & Storage Company, R. W. Wood of the Wood Ice Company, W. D. Miles and A. Menny, manager of the People's Ice & Fuel Company.

Some time previously these same gentlemen had acquired what was known as the Grand Avenue plant, having purchased this plant for about $30,000. Considerable improvements were made on that plant prior to July 1, 1905.

In June, 1905, the People's Ice & Fuel Company had in force several ice contracts of the kind already mentioned. Its contract of February 6, 1903, with the Vanderslice-Lynds Mercantile Company was for 29,700 tons of artificial ice at two dollars per ton, deliverable at the Mercantile Company's plant on board wagons or cars, 9900 tons deliverable in 1903, 1904 and 1905, each. Of this annual quantity 600 tons were to be delivered in April; 750 tons in May; 1500 tons in June; 1800 tons in July and August, each; 1500 tons

in September; 1050 tons in October and 900 tons in November in each of the three years.. The Armour Packing Company contract, dated February 6, 1903, covering three years, called 'for the delivery to the People's Ice & Fuel Company of 50,100 tons, one third in each year for three years. The deliveries for each year by months, to be as follows: January 1400 tons; February 1300 tons; March 1000 tons; April 500 tons; May 500 tons; June 2000 tons; July and August 3500 tons each; September 2000 tons; October 1000 tons. The February, 1903, contract between the Jacob Dold Packing Company and the People's Ice & Fuel Company, called for the delivery in each of the three years of 14,000 tons or a total during the three years of 42,000 tons, as follows: May 1750 tons; June 3000 tons; July 3250 tons; August 3500 tons; September 2500 tons. Contracts of like character and covering about the same period between the People's Ice & Fuel Company and other companies represented on its directorate were also entered into. Like contracts had covered the whole period from the organization of the People's Ice & Fuel Company. Among other things these 1903 contracts provided that the failure of the People's Ice & Fuel Company to take the full annual amount contracted for subjected that company to a forfeiture of fifty cents per ton on the deficiency and, in case that company bought ice *from any company with "which it has not a contract at this date,"* the obligation to take the full amount contracted for became absolute and the deficiency clause did not apply. Another clause provided that in case the People's Ice & Fuel Company made "a contract with any one to buy artificial ice at a higher price than two dollars a ton during the life of this contract, then such additional price shall be paid by said second party to said first party for all ice *delivered or to be delivered* under this contract." These provisions did not appear in the 1906 contracts hereafter mentioned.

As stated, prior to June, 1905, the stockholders of the People's Ice & Fuel Company, which was purely a selling company, had purchased and owned the stock of the Grand Avenue Ice Company and, July 1, 1905, the defendant People's Ice, Storage & Fuel Company was organized with a capital of $170,000. The new company took over the plant and equipment of the People's Ice & Fuel Company and the plant of the Grand Avenue Ice Company, the stock in the new company being issued to the stockholders in the old company (People's Ice & Fuel Company) in proportion to the sum of the stock held by each in the old company and the Grand Avenue Ice Company. The only important change in the charter was the addition of authority to do a storage business, the change being made necessary by the fact that Mr. Winants of the National Bank of Commerce, a stockholder in the old company representing the bank mentioned, required that change before his bank would make loans on warehouse or storage certificates issued by the company. The new company took over all the assets, including leases on plants of other companies, and assumed all the liabilities of the old, including the ice contracts theretofore entered into by the old company, most of which had until the following February to run. There was no change in the officers or management, the same books were used and the methods of business were identical with those theretofore employed. The employees and equipment were the same. The stockholders, organizers and directors of the new company were those who had just previously been the nominal stockholders of the old company except that one share, each, was issued to Burk, the secretary of the old and new companies, one to Marion L. Dean, and one to A. J. Menny to qualify them for the directorate, and except that J. C. Dold, president of the J. C. Dold Packing Company, of Buffalo, New York, who was a stockholder in the old company, did not appear in the

articles of incorporation as one of the original incorporators of the new, though he was in fact so. H. Vanderslice held 245 shares; J. J. Heim 266 shares; W. H. Winants 250 shares; R. W. Wood 259 shares; W. D. Miles 281 shares and A. Menny 396 shares. Total, 1697 shares, which, with the three shares previously mentioned totaled 1700 shares, representing the capital stock of $170,000. Heim held his shares for the Kansas City Breweries Company; Winants, for the Bank of Commerce; Vanderslice (and subsequently Lynds) for the Vanderslice-Lynds Company. The assets of the People's Ice & Fuel Company were taken over at a valuation of $100,000 and the Grand Avenue plant at a valuation of $70,000. Immediately after the incorporation of the new company Winants transferred 240 shares to the National Bank of Commerce; A. Menny transferred all of his shares except 164; Vanderslice transferred 128 shares to J. H. Lynds, of the Vanderslice-Lynds Mercantile Company; 227 shares were transferred to J. C. Dold; H. L. Burk, manager of the company, sometime prior to July, 1906, acquired seven more shares. Dean disappeared as a stockholder, and Wood and Miles retained their original holdings. In February, 1906, at the expiration of the several 1903 contracts of the People's Ice & Fuel Company (the old company) which had been assumed and carried out by the People's Ice, Storage & Fuel Company (the new company) new contracts were entered into.

The Kansas City Breweries Company, which, in the fall of 1905, had succeeded and carried out the contract of the Ferd Heim Brewing Company, as well as purchased the stock the latter had held (in the name of Mr. Heim) first in the People's Ice & Fuel Company and then in the People's Ice, Storage & Fuel Company, entered into a contract with the last named company, dated February 26, 1906, whereby it agreed to furnish that company 11,330 tons per annum for three years

at two dollars per ton, 500 tons in February, March and April, each; 680 tons in May; 1150 tons in June; 2250 tons in each of the months of July and August; 1500 tons in September; and 1000 tons in October and November, each, amounting to 11,330 tons for each of the three years, or a total of 33,990 tons, all artificial ice. The Vanderslice-Lynds Mercantile Company entered into a like three years contract, dated February 16, 1906, whereby it obligated itself to furnish a total of 33,000 tons, 11,000 tons per annum; 500 tons in March; 600 tons in April; 850 tons in May; 1500 tons in June; 1800 tons in each of the months of July and August; 1500 tons in September; 1050 tons in October; 900 tons in November and 500 tons in December of each year. The Jacob Dold Packing Company entered into a like contract, dated February 9, 1906, contracting to deliver 16,300 tons in 1906 and 15,000 tons in 1907 and 1908, each; 2500 tons in May, 1906, and 2000 tons in May, 1907 and 1908; 3300 tons in June, 1906, and 3000 tons in June, 1907, and June, 1908; 3500 tons in each of the months of July and August in all three years; 3500 tons in September, 1906, and 3000 tons in September, 1907 and 1908; total 46,300 tons.

The Consolidated Light, Power & Ice Company of Joplin also entered into a contract, dated March 20, 1906, to deliver to the People's Ice, Storage & Fuel Company, between the date of the contract and September 1, 1906, time of delivery at the option of the latter, 2500 tons of ice at four dollars per ton, f. o. b. Kansas City.

The Inter-State Ice & Cold Storage Company, of which Thomas P. Ruddy was president, contracted under date of February 28, 1906, to deliver f. o. b. wagon or cars at its plant in Kansas City, Kansas, 5520 tons of ice, at $3.25 per ton; 900 tons in the last half of June; 1860 tons in July and a like amount in August, and 900 tons in the first half of September; all to be delivered in 1906. The deliveries under this

contract had not commenced July 15, 1906, the plant of the Inter-State Company having been undergoing enlargement which the contract contemplated and which had not been completed.

The Santa Fe Car Icing Company was also under contract, dated June 29, 1906, to deliver 7000 tons of ice f. o. b. cars at its plant in Argentine, Kansas, at $3.50 per ton, the whole amount to be delivered by September 15, 1906, not more than 3500 tons in any one month.

The People's Ice & Fuel Company had in 1905 acquired a ten-year lease on the plant of the Western Ice & Cold Storage Company plant which lease was, July 3, 1905, assigned by it to the People's Ice, Storage & Fuel Company. The latter, in January, 1906, secured a lease for five years on the plant of the Westport Crystal Ice Company, of Kansas City.

In 1905 and at the time of the trial the capacity of the Ferd Heim Brewing Company's ice plant was about 110 tons per day when run at full capacity and the brewing company itself on some days, as early as 1898, required as much as fifty tons and on others practically none, Mr. Heim stating that there was no method by which he could arrive at the average daily requirements of the brewery company.

The capacity of the Vanderslice-Lynds Mercantile Company's ice plant at the same times was somewhat less than seventy-five tons per day in hot weather. The amount of this output required for that company's own needs, if any, does not appear.

The capacity of the Jacob Dold Packing Company's plant was nearly 125 tons per day when in running order. The entire actual output during May, June and in July to the time of the hearing (except twenty-eight tons sold to the National Packing Company) was sold and delivered to the People's Ice, Storage & Fuel Company, the deliveries in May exceeding the requirements of the contract by more than one hundred tons.

The Grand Avenue plant, owned by the People's Ice, Storage & Fuel Company, had a capacity of sixty or sixty-five tons per day. The plant of the Western Ice & Storage Company, leased to the People's Ice, Storage & Fuel Company, had a capacity of one hundred tons per day and new machinery about ready for use at the time of the hearing increased that to 175 tons per day. Taking into consideration all the ice sold by the People's Ice, Storage & Fuel Company, the average per day for the entire year was about 197 tons, the daily average from June 15 to September 15 was about 578 tons and the daily average during July and August somewhat more than that figure. Of the total the People's Ice, Storage & Fuel Company owned or leased plants with sufficient capacity to produce about 180 tons per day, exclusive of the 100 ton addition to the plant of the Western Ice & Storage Company.

Excepting the original respondents in this case the companies making ice in Kansas City and vicinity were the Crystal Springs Ice Company, Kansas City, Kansas, capacity 50 tons per day; the Leed's Ice Plant, capacity 30 tons per day; The Armour Packing Company, 150 tons per day; the Santa Fe Car Icing Company, 140 tons per day, located at Argentine, Kansas; the Independence plant, Independence, Missouri, capacity 50 tons. The first named company also handled about two cars (40 tons) of ice from Galena, Kansas, and the Leeds Company handled a car per day from Paola, Kansas. The Swift Packing Company was installing a 200 ton plant and the Morris Packing Company made about 100 tons per day, but neither was selling ice on the Kansas City market at the time of the hearing.

The evidence also disclosed that what was called "the ice season" extended from about June 15 to September 15 of each year, during which time the demand for ice was enormous. The natural ice crop in the

vicinity of Kansas City in the winter of 1905 and 1906 was a failure. The Armour Packing Company which usually stored 80,000 tons or more of natural ice was unable to store any and, consequently, for use in its own business, was relying upon the artificial ice from its plant. Neither that company nor R. W. Woods, one of the stockholders of the People's Ice, Storage & Fuel Company and a dealer in natural ice, entered into any contract with the People's Company in 1906. As Mr. Woods testified, he "had nothing to sell." None of the respondents save the People's Ice, Storage & Fuel Company and the Central Ice Company, delivered ice by wagons on regular routes, though Vanderslice-Lynds sold ice to three or four peddlers who operated their own wagons and who had bought from that company from the time it began the manufacture of ice. The only other companies operating wagons on the streets were the Crystal Springs Company of Argentine, Kansas, which appears to have operated wagons in Kansas City, Kansas; the Standard Ice Company, under which name the Leeds Plant, some three to five miles out of the city, was operated, and possibly the Inter-State Ice & Cold Storage Company had operated some wagons a while. Some other companies sold ice to peddlers at times but it is not made clear what amount of ice reached the daily market by this channel.

The Central Ice Company, one of the defendants, was shown to have a capacity of 350 tons per day at the time of the hearing and it also shipped in ice from outside sources. It operated wagons of its own and also sold to peddlers who ran their own wagons.

In March, 1906, the price of ice in Kansas City to peddlers and distributors, uniformly made by all producers and importers, was three dollars per ton. On the first day of April this price was raised by all to four dollars per ton and on May 1st it was again uniformly raised by all to five dollars per ton. On the

23d of June this proceeding was instituted. The retail prices were raised to conform to the increase in the price made the peddlers. Notices of uniform increases on April 1st and May 1st were mailed out some days in advance by the People's Ice, Storage & Fuel Company and the Central Ice Company to their respective customers, the peddlers or drivers for each company getting their notice of the increase in the wholesale and retail prices from the company, direct, or from the weighmaster at the plant at which they obtained ice, and the peddlers operating their own wagons getting their information, often, when the increased price was exacted of them. These last conformed their retail prices to those of the People's and Central Companies, which were identical and conformed to the notices sent out. There had been no scarcity of ice in 1906 to explain the increase in prices and some of the plants of the companies named had not been, prior to the hearing in July, run at their full capacity all the time. The officers of defendants explained the increase as due to the failure of the natural ice crop and the consequent change in the ratio of the demand to the supply of artificial ice.

The Central Ice Company and the People's Ice, Storage & Fuel Company furnished about seventy-five to ninety per cent of the ice used in the Kansas City market, except that consumed by large plants which, in the main, made their own ice.

The Central Ice Company was organized about 1902 or 1903 by W. F. Lyons, who became its president, principal owner and, it seems, manager. He had full control and charge of the company's business, as his own testimony clearly indicates. This company furnished no ice to the People's Ice, Storage & Fuel Company but had twenty-seven or twenty-eight wagons of its own which it used in delivering ice. It also sold ice to about thirty or thirty-five peddlers who used their own wagons in delivering. The People's

Ice, Storage & Fuel Company operated fifty-seven or fifty-eight ice wagons of its own and also sold to about sixty-five or seventy peddlers who delivered in their own wagons. Some of these peddlers operated more than one wagon. Most of them, nearly all of them, procured their ice supply from the People's Ice, Storage & Fuel Company or the Central Ice Company. All of them conformed to the retail prices made by the People's and the Central companies, except in a few isolated sales. O. W. Butt, formerly of the Kansas City Ice & Cold Storage Company and one of the organizers of the first distributing company, the old People's Ice & Fuel Company in 1898, testified that the People's Ice & Fuel Company and the Central Ice Company, after it was organized, entered into "a gentlemen's agreement to be good to each other." The representatives of the People's Ice, Storage & Fuel Company, "had several talks with Mr. Lyons, representing his company, and it was agreed" that "each should respect the other's customers," and it was also agreed that "a usual and uniform price" should be maintained and the two sell at the same price. Butt further testified that in the fall of 1905 or spring of 1906 he contemplated buying into the Central Ice Company and that Lyons, its president, during the pendency of their negotiations, made a general statement of the financial condition of the company. During the discussion Butt asked Lyons how he "was going to conduct the general business, now" and whether he was still "maintaining those prices." The witness testified "he said yes, they were still working along under the same arrangement."

O. P. Street was engaged in the ice business in Kansas City in 1905; dealing principally in natural ice. A. J. Morris and H. R. Clauss were associated with him and the business was done under the name of the Consumer's Ice Company. This company pro-

cured a small supply of artificial ice from Galena,. Kansas (Street being interested in an ice company there) and Pittsburg, Kansas. The principal part of their ice was natural ice from Moline, Illinois. The Consumer's Ice Company began their 1905 business. in May, 1905, and made a price to peddlers of three dollars per ton. At this time the People's Ice & Fuel Company (the old distributing company), the Central Ice Company and practically all, if not all, other ice companies (except the Imperial Brewing Company) were maintaining a price of $3.50 per ton, to peddlers. In the early part of May, 1905, Street had a conversation with A. Menny, the manager of the People's Ice & Fuel Company, at his office, concerning the price of ice in Kansas City for 1905 but the details of this conversation were excluded by the learned commissioner. Street testified that in June Lyons, president of the Central Ice Company, visited the office of the Consumer's Ice Company and took up the question of the prices of ice. He made inquiries of Street, Clauss and Morris as to whether it "would be agreeable to" them to advance prices to $3.50 for natural ice and four dollars for artificial ice. Lyons stated that he had been in consultation with the People's Company. Street's company deferred giving a definite answer and Lyons visited them again and was told the Consumer's Ice Company had decided not to advance prices. Later, about June 20 or 25, Lyons again approached the members of the Consumer's Ice Company and told them they "had one more opportunity to advance prices." He was very anxious to secure an agreement to make the advance but was told that the Consumer's Company did not look upon the proposal with favor, but a final conclusion would be reached in a few days. That answer was a refusal to enter into the agreement for the advance. Lyons took the matter up with Street thereafter, deploring the fact that prices were not *higher*, and finally stated

that if the Consumer's Ice Company did not agree to the advance "there certainly would be *lower* prices for ice." A few days thereafter and about June 25 or 28, the Central Ice Company and the People's Ice & Fuel Company did cut the price to two dollars per ton for natural ice and to $2.85 per ton for artificial ice, and these prices were maintained until the Consumer's Ice Company failed, about sixty days later. The evidence showed that the Consumer's Ice Company's natural ice cost it $2.25 to $2.50 per ton f. o. b. Kansas City and that the artificial ice it handled was almost a negligible quantity. These facts were testified to by Street, and Lyons, recalled, admitted having frequent conversations with Street and his associates; admitted stating that they were selling ice too *low,* denied endeavoring to arrange any advance on the part of the Central, the People's and the Consumer's companies, but did not deny cutting the prices as Street testified.

Dr. Henry Croskey testified to a conversation with W. F. Lyon, president of the Central Ice Company, in April, 1906, in which he asked Lyon what effect the hot weather would have on ice. In the language of the witness:

"He says, 'Well, it is going to raise the price.' I says, 'Why, you can manufacture it for ninety cents or $1.25.' 'Yes,' he says, 'but there is no money in that.' He says, 'You can't buy any natural ice, and you have to depend on artificial ice. Of course, we are going to make something out of it.' I said, 'Well, it will not affect me much; I have been buying my ice from Murphy for eight years. I have only been paying him thirty cents a hundred, and, of course, Murphy will not raise it on me.' He says, 'Yes, indeed, he will, because I have already raised it on him, the price of ice; we will raise it again, and we will have to charge him more for it.' I says, 'If Murphy is going to charge me more than that I am going to look around

for somebody to buy ice from.' He says, 'That will not do you any good either,-because *we all intend* to raise the price of ice, and you cannot get it any cheaper.' ''

Lyons admitted having a conversation with Dr. Croskey at the place Croskey named but said it occurred in May of 1906. Lyons detailed the conversation as follows:

''He called across the corner to me, and said, 'Have you raised the price of ice, too?' I said, 'Yes, I have.' 'Well,' he says, 'what is your reason for raising the price of ice?' I told him on account of the hot winter and scarcity of the product. He says, 'I don't believe Murphy will raise on me; I have been buying from him a great many years' or a 'good long time.' I don't remember that he stated eight years or any definite period. He told me he had been buying from him for some time, and that he didn't believe Murphy would raise his price. He said his price was thirty cents a hundred. I said to him, 'Neither he nor any one else can furnish you that ice at that price this year, if we should have a hot season, if we get a warm season; on account of the conditions of the ice market today, men who are now manufacturing ice will be glad to get it at thirty cents a hundred in carload lots. I have already raised my price on Mr. Murphy and expect to have to do it again.' He commenced talking to me about everybody going in and raising the price, and I just finished my dinner and got up and left.''

Mr. Joseph Heim testified that the Kansas City Breweries Company had no agreement with anyone as to the amount of ice it should make nor any agreement as to the price at which it should sell. Mr. Vanderslice gave like testimony as to the Vanderslice-Lynds Mercantile Company. Neither of these gentlemen nor any other, however, though both of them and Mr. Miles seem to have been present at the time, de-

nied the testimony as to the original purposes of the formation of the People's Ice & Fuel Company as detailed by Butt and Trask. There was evidence that the Breweries Company and the Vanderslice Company sold ice to others than the People's Ice, Storage & Fuel Company but not to peddlers except as already stated. The quantity of ice sold at retail and to retailers by these companies was practically negligible. H. L. Burk was the secretary of the People's Ice, Storage & Fuel Company, and, according to his own uncontradicted testimony, the whole power to fix prices of ice was in his hands. He consulted no one, in or out of the company, but made prices as he pleased. He originally (July 1, 1905) had one share of stock but before the hearing had acquired seven more, he testified. The testimony of the officers and directors of the company tended to corroborate Burk as to his control of prices. Lyons testified he generally conformed his (Central Ice Company's) prices to those made by the People's Ice, Storage & Fuel Company, that he watched their prices and when they advanced the price he did likewise. He said that on one occasion he made the price "down town seven dollars a ton and collected the money for the ice;" that he "thought was going to be the regular price" but found it was not but that "it was six dollars instead of seven dollars" and had to refund the difference. It also appeared that as the price to peddlers was advanced the prices to consumers were also advanced, these prices being graduated on a scale depending upon the daily requirements of the customer. The price (after May 1, 1906) delivered in wagon load lots (5000 lbs) was $5.50 per ton; less than 5000 lbs and a cake (300 lbs) or more, $6 per ton; less than a cake, to business houses, at the rate of $7 per ton; to families, $10 per ton. These prices, prior to May 1, 1906, had been, respectively, at the rate of $4.50, $5, $6 and

$8 per ton. The prices of the People's and the Central companies were identical in point of time and amount.

1. The action of the circuit court in referring the case is assigned for error. It is not necessary for us to follow counsel through the authorities cited upon the question of the referability of this proceeding for the reason that the referee was appointed at the June, 1906, term of court and no term bill of exceptions was filed nor was leave taken at that term to file such a bill for the purpose of preserving exceptions to the court's action. The recital in the bill filed by leave given at a later term cannot avail to save the point. [Smith v. Baer, 166 Mo. l. c. 401; Dean v. Railroad, 229 Mo. l. c. 439, 440; State v. Bonner, 5 Mo. App. l. c. 16.] Neither do the objections made before the referee at the beginning of the taking of testimony before him furnish any support for this assignment. Objections on this head must be made at the time of the appointment and made to the court itself. The referee, or commissioner as he was dubbed in this case (Peabody v. Munson, 211 Ill. l. c. 326), has no more power to set aside his appointment, on the ground that the cause he is about to hear is not referable, than he has to appoint himself referee in the first place.

It may also be observed here that the action of the trial court in overruling the motion to set aside the appointing order and the motion to strike out the testimony on the ground that the case was not referable and consent had not been given, all of which motions were filed after the report was in, is in full harmony with principles heretofore laid down. [Young v. Powell, 87 Mo. l. c. 130; Conley v. Horner, 10 Okla. l. c. 278.]

2. An exception not properly preserved is no exception at all. Consequently this record presents a case in which the trial court referred the issues at the relator's instance without exception being taken. It

was too late after the report was filed to move for trial by jury (Smith v. Baer, supra, l. c. 402; Grant v. Hughes, 96 N. C. l. c. 189), and consequently the right to such trial in a case of this kind is not presented by this record.

3. After the report of the referee and relator's exceptions thereto had been on file some six months and the exceptions had been argued, submitted, taken under advisement and sustained, and partial findings of fact and conclusions of law, so the record recites, had been filed by the court below, appellants on May 14, 1907, the day the order sustaining the exceptions was finally made, filed seven separate motions to strike out all or certain parts of the evidence taken by the referee. Two of these motions were filed by the People's Ice, Storage & Fuel Company, one to strike out all the evidence and one to strike - out merely that part of the evidence relative to the organization of the People's Ice & Fuel Company, and to the objects and purposes of such organization. These motions were overruled and exceptions taken. Thereafter and at "eleven o'clock a. m." on the same day, the People's Ice, Storage & Fuel Company filed its application for change of venue on the grounds of the bias and prejudice of the judge against it. The application was signed by the applicant's counsel and was sworn to by its secretary, H. L. Burk, on May 13, 1907, the day before the application was presented and before the several motions mentioned were filed and disposed of. No notice of the intended presentation of the application was given the prosecuting attorney until immediately at the time the application was filed.

Under such circumstances the trial court's ruling refusing a change of venue could not be disturbed (St. L., C. G. & Ft. S. Ry. Co. v. Holladay, 131 Mo. l. c. 452, 453) even if it could be conceded (which it is not) that the general rule that a case cannot be cut in two by a change of venue after the filing of a ref-

eree's report (Woodrow v. Younger, 61 Mo. 395) is inapplicable in view of the peculiar facts of this case.

4.     Despite the fact that the circuit judge set aside the referee's report and made findings of fact of his own, it is insisted that the judgment, based on the court's findings, must be reversed if there is any substantial evidence in the record supporting the findings of the referee.

(1)  This is not a reference by consent and, consequently, the rule in such references with regard to the finality of the referee's findings of fact (Caruth-Byrnes Hardware Company v. Wolter, 91 Mo. 484; State ex rel. v. Hurlstone, 92 Mo. 1. c. 332) is not applicable to this case.

(2)  Nor is the rule applicable in references in suits in equity, applicable here.  Proceedings by information in the nature of *quo warranto* not instituted under the statute, owe their origin to the common law (High on Extr. Legal Remedies, sec. 593; State ex inf. v. Standard Oil Co., 218 Mo. 1. c. 345; State ex rel. v. Rose, 84 Mo. 1. c. 202; State ex rel. v. Miller, 1 Mo. App. 57, 67, 68) and equitable rules, generally speaking, are not applicable to them.

The information, rule issued thereon, and relief granted are not consistent with any contention that this proceeding is other than an ordinary proceeding by information in the nature of *quo warranto*.  The case was tried below on that theory and in their briefs and arguments here appellant's counsel adhere to the trial theory.  There is no contention that the proceeding is one in equity—but the contrary.

We agree with the view of the trial court and counsel on both sides that this is a proceeding by information in the nature of *quo warranto* despite the presence in the information of a prayer for an injunction.  The remedy by injunction, if any exist, to restrain corporations from continuing unlawful combinations, and that by *quo warranto* are wholly incon-

sistent and cannot be prosecuted to judgment at the
same time even separately (The Attorney-General v.
Railroad Companies, 35 Wis. 1. c. 595, 596), for ob-
vious reasons. *Quo warranto* goes to the life of the
corporation informed against while a proceeding to
enjoin is necessarily predicated upon an anticipation
of the continuance of the defendant's corporate ex-
istence.

There are reasons, also, to question the right of a
prosecuting attorney in 1906 to institute injunction
proceedings under the statute then in force (R. S.
1899, Sec. 8979) except by direction of the Attorney-
General (of which there is no pretense in this case)
and certainly he could not proceed outside the statute
in a case of this kind by injunction against corpora-
tions whose business was not affected with a public
interest. [Attorney-General v. Insurance Company,
74 N. J. Eq. 372; Cook on Corporations, Sec. 635.]

It is not necessary to elaborate these suggestions,
however, since the case was tried below and heard
here upon the theory that it was purely a proceeding
by information in the nature of *quo warranto* and on
that theory it must be decided by us. The rule in
equity, therefore, with respect to weighing evidence,
is inapplicable.

(3) Nor can we apply the rule laid down by the
statute (R. S. 1909, Sec. 2013) for the government of
those cases in which the report of the referee was
approved by the trial court, for the obvious reason
that the report in this case was not approved, but ex-
ceptions thereto sustained and independent findings
made by the court.

(4) The question which confronts us in this case
really is as to what presumptions support the findings
of the trial judge, made on the evidence after the ref-
eree's report has been set aside in the exercise of the
court's unquestionable discretion so to do (Utley v.
Hill, 155 Mo. 1. c. 276) in a case referred by compul-

sion.  For the purpose of determining this question we must, since no exception to the reference was saved so that it can be considered here (Smith v. Baer, 166 Mo. l. c. 401; Tinsley v. Kemery, 170 Mo. l. c. 316), treat the case as one compulsorily referable.

In such cases it is the settled law of this State that the trial court "may act upon the report of the referee and find therefrom different conclusions of fact from those reported by the referee."  [Utley v. Hill, 155 Mo. l. c. 276.]

Once at least this Division has expressed itself directly upon the point.  In the case of Utley v. Hill, 155 Mo. l. c. 258, it was said that the finding of the trial judge in sustaining exceptions on conflicting evidence, when assailed in this court as against the weight of the evidence, would not be reviewed "because it is the settled practice of this court not to review conflicting evidence, nor to review the rulings or findings of the trial courts on such evidence."

It is true that the evidence was not before the court and the point need not have been discussed. The fact that the remark quoted was *obiter* does not, however, deprive it of all its value.

In the case of Williams v. Railroad, 153 Mo. l. c. 511, it was held by Division Number Two of this court, that in case of a conflict between the findings of the circuit court and the referee the presumption in this court was "in favor of the judicial action of the circuit court whose duty and prerogative it was, in a case like this, to examine the report of the referee in the light of the evidence and affirm or reverse his action."  The court declared that rule to be "in harmony with our practice in reviewing the granting or refusing of new trials," and held that "the presumption is in favor of the action of the trial court and it is *only where we find it has abused its discretion do we interfere with its judgment.*"

In the case of Smith v. Baer, 166 Mo. l. c. 406, 407, it was said that "under the Constitution, this court has a right to review the facts as well as the law in any case, however it may have been tried, but it has not been its practice to do so, except in extreme cases, in actions at law, for the reason that experience has shown that it was not necessary to do so to insure a proper administration of justice. . . . This court always looks into the record, when requested; and the point is properly made in the lower court, far enough to see whether there is any substantial evidence to support a finding of fact, by *whomsoever that finding is made,* and this is as far as experience shows that it is necessary, ordinarily, to go."

In Caruth-Byrnes Hardware Company v. Wolter, 91 Mo. 484, the reference was by consent and the question presented there was wholly different from that appearing for solution here. Nevertheless the court in that case, in discussing the finality of the referee's findings of facts, said: "Under the present statute, the constant practice in a large class of cases is for the courts to review the findings of the referee upon the evidence reported by him, and to correct the findings when erroneous. When the evidence is preserved, these findings may be reviewed and corrected on an appeal to this court." The question presented in that case was as to the power of the circuit court to revise the referee's findings in a case referred by consent and what is said with respect to findings in other classes of cases is not so authoritative as what is said on the point actually before the court for decision. The cases cited in support of the holding quoted do not support it if it is to be interpreted as laying down a rule that this court will set aside the findings of the trial court in this sort of a case merely on the weight of the evidence. Two of the cases cited were equitable in their nature and in the other the trial court had merely referred the report

of a receiver—and the questions reviewed in this court in this last case were rather of arithmetic and law than of fact in the ordinary sense. Certainly a finding of fact based on a mere mathematical computation is reviewable since any other finding than a correct one has *no* evidence to support it.

But the question before the court in Caruth-Byrnes Hardware Co. v. Wolter, was the right of the circuit court, in a case *referred by consent*, to make findings contrary to those of the referee and render judgment thereon. Nor did the court in that case lay down any rule that it would examine and pass upon conflicting evidence in a case like that now at bar and make its own findings in accordance with its own views of the weight of the evidence. It was merely held that findings of the trial court contrary to those of the referee might be "reviewed and corrected on appeal."

It is to be noted that the remark there made seems as applicable to the review of the findings of the referee which have not been "corrected" by the trial court as to those which have. The premises considered we conclude that the Wolter case is not an authority for the proposition that this court will weigh conflicting evidence in a case of this kind.

That the language used in that case is not out of harmony with the rule laid down in Williams v. Santa Fe Ry. Co., supra, is shown by the fact that in the latter case the Wolter case is cited in support of this court's power to review the court's findings of facts (153 Mo. l. c. 495, 511).

In West v. Bank, 110 Mo. App. 496, the St. Louis Court of Appeals had before it the question whether the findings of fact by the trial court, after sustaining exceptions to the referee's findings, ought to be upheld, and Judge GOODE, in concluding an opinion in which the Court of Appeals gave its reasons for refusing to interfere, said (speaking of a contested

item): "The evidence in regard to this item leaves a doubt in our minds as to what the truth is; hence we do not feel justified in interfering with the finding below."

In an action at law tried before the court, the rule which affirms the finality of the trial court's findings of facts is no less applicable to cases in which the testimony is wholly by deposition than to any other. Nor does the fact that one judge hears the evidence and another decides the case on the transcript thereof affect the rule (Handlan v. McManus, 100 Mo. l. c. 128, 129). In case of a reference of the kind before us, "The referee's power is limited to recommending judgment. The duty and responsibility as to the judgment rest upon the court. The reference can aid but not bind the judge." [Utley v. Hill, 155 Mo. l. c. 277.] If this court is to weigh the evidence in a case of this kind merely because the trial court acted on written evidence alone, then, also, must we, to be consistent, pass upon the evidence in all actions at law tried to the court on depositions and overrule the cases holding that we will do no such thing. By establishing such a rule we can encumber our reports with the consideration of matters which can have no possible value as precedents. We do not think it wise to encourage appeals to this court on mere questions of fact in actions at law, regardless of the method pursued in determining such questions below.

In discussing a question like that here presented and which arose under a statute somewhat similar to our own, the Supreme Court of Oregon, in Liebe v. Nicolai, 30 Oregon, l. c. 372, 373, said:

"From this it would appear that the power of the court to set aside the findings of a referee is not limited to a question as to the sufficiency of the evidence to justify the conclusion reached by him, but, in our judgment, extends to all the causes prescribed by the statute for setting a verdict aside; and, if the

referee's findings were, by statute, made special verdicts upon the issue, instead of being deemed and considered as such, the power of the court to set them aside could not be questioned, and its action in doing so would not be reviewed on appeal, except for an abuse of discretion; and hence the question is narrowed to a consideration of the legal effect of the court's modification of a referee's finding. If the court, upon setting aside such a report, took the evidence anew, and found therefrom the facts, and determined the law itself, a judgment given thereon, supported by any evidence, ought not, on principle, to be subject to review on the facts; but when the court, from a mere examination of the evidence taken and reported by the referee, reaches a conclusion different from that officer, it may be conceded that the variance is not the result of superior advantages possessed by the court, for it does not possess the opportunity afforded the referee of seeing the witnesses as they appeared upon the stand, or of observing their tone, manner and bearing while giving their testimony. It might appear to us, from the examination of a bill of exceptions, that the findings of fact made by the trial court were opposed by the great weight of evidence, yet by reason of its intimate knowledge of the parties, and its ability to note the peculiarities of the witnesses, which can never by any means be made a part of the record, its conclusions of fact must necessarily be presumed to have been carefully reached. It is the application of this rule that prompts the trial court to affirm the report of a referee, although it might have reached a different conclusion from an examination of the evidence reported; but to say that the findings of fact made by a referee are entitled to greater consideration than the conclusions reached by the trial court, after an examination of the evidence, is to concede that, while the court possesses power to set aside such report, its action in that respect is

nugatory on appeal, unless its findings are supported
by a preponderance of the evidence. Such seems to
have been the rule adopted in Merchants' Nat. Bank v.
Pope, 19 Ore. 35, for the learned chief justice in com-
menting upon the facts, says: 'I have examined the
evidence as to the amount of commissions which the
said firm was to receive upon the shipment and sales
of the oil and fish, and am of the opinion that the
circuit court very properly made the reduction in the
amount found to be due by the referees.' The effect
of such a rule, if applied to an appeal from a judgment
in an action at law in which the court had set aside
the findings of a referee and reached conclusions of its
own from a mere inspection of the evidence reported,
would be to deprive the findings of the court of all
presumptions of regularity which may be invoked in
their favor, and the cause would come here for trial
*de novo*, as in equity cases."

And the court further said in the same case:

"The trial court not only possesses the power to
set aside the report of a referee, but upon doing so
its findings of fact, although derived from an inspec-
tion of the evidence so reported by the referee, is, in
our judgment, a new trial by the court, and, as such,
the findings so made are entitled to every intendment
and presumption that could be invoked in their favor
if made upon an original trial by the court. To reach
a different conclusion would be equivalent to holding
that the trial court, on setting aside the findings of
a referee, must hear the testimony, and take the evi-
dence anew, before it could reach a finding of fact of
its own; and, as the statute has not prescribed such a
mode, we cannot think a procedure of this kind neces-
sary in order to give to the findings and judgment
that presumption of regularity to which it is entitled,
and must, therefore, hold that the duty of the referee
is to advise the court, when so ordered, but that the
power appointing him may disregard his counsels, and

make its own conclusions from the evidence submitted. Having reached this conclusion, it only remains to be said that, while the evidence is conflicting upon this subject, there is, nevertheless, some testimony that tends to support the court's findings."

This ruling was made on a statute which provided that the referee's report when made should, in the consideration of exceptions thereto, stand as the verdict of a jury, whereas, in this State, the statute gives the effect of a verdict to the report only when it has been *approved* by the trial court.

Judge BREWER in the case of Owen v. Owen, 9 Kan. 91, took occasion to compare the positions of the trial and appellate courts with respect to the matter of passing upon the report of a referee as follows:

"Counsel . . . claims that inasmuch as the judge of that court does not see the witnesses who appear before the referee, does not hear them testify, nor know in what manner their testimony is elicited, his judgment can be based only upon the record of that testimony. Hence the report of the referee should stand unless a great preponderance of the evidence is against it. He further claims that this court has the same opportunity as the district court of weighing correctly the evidence, and that therefore unless the great preponderance of the testimony seems to us against the report we should reverse the order of the district court setting aside the report, and direct its confirmation. These rules applied strictly would make the approval or disapproval of the report of the referee by the district court a mere matter of form, purely a work of supererogation. We do not so understand the effect of the action of the district court. We think the district court should not set aside the report of a referee as against the evidence unless it clearly appears to him that the referee has failed to give due consideration to some of the testimony, and that a strong preponderance of the testimony is

against the report. He will presume that the referee has given due weight to all the evidence, and that his conclusions therefrom are correct. He will be slow to interfere with those conclusions. But if he is convinced of the error of that report, and orders it set aside, such judgment of the district judge should and will carry great weight with this court, for he is in a better position than we are to determine as to the correctness of the referee's conclusions. The parties to the suit he may know; the witnesses may have been before him in other trials, or he may have heard their testimony on motions in this case. He may understand peculiarities in the mind of the referee which would cause certain kinds of testimony to have undue weight with him. He may be cognizant of personal friendships or antipathies between the referee and the parties, or counsel. He will probably be aware of any difference between counsel in the manner of eliciting testimony, in their adroitness in presenting and withholding evidence, in short, being nearer to the parties and the proceedings, he is more apt to know whether the report of the referee expresses the absolute truth. And when he has acted upon the report we shall not ignore that action and consider the report as though made originally to this court.''

These remarks were made in considering a question somewhat different from that under consideration here but are valuable as indicating the views of a great jurist upon the reasoning which lies at the foundation of appellant's contention on the point being discussed.

In South Carolina it is held (Gregory v. Cohen, 50 S. C. l. c. 511) that the Supreme Court will not weigh the evidence in passing upon the correctness of the findings of the circuit court made after exceptions to a referee's report have been sustained. The Constitution of that State, however, limits the Su-

preme Court to the correction of errors of law in appeals in actions at law.

In the case of Merchants' Bank v. Kern, 193 Pa. St. 67, 88, the Supreme Court of Pennsylvania held that the findings of the common pleas court, after setting aside the report of a referee, could be overturned by "nothing but a clear conviction that the court had erred." The findings of the referee in that case were out of accord with the verdict of a jury on a previous trial.

In North Carolina it is held, unhesitatingly, that the findings of the circuit court, "reversing the findings of the referee" cannot be disturbed if there is any evidence to support them. [Baggett v. Wilson, 152 N. C. 182.]

Certain decisions under statutory provisions differing materially from ours, as in Wisconsin, New York, Iowa and (in some instances) Pennsylvania, are not in point on either side of the question and need not be discussed.

The rule laid down in Utley v. Hill, supra, is thus found to have the support of authority in and out of the State and a careful investigation fails to disclose a well considered decision in point which holds the contrary.

Were there not express authority given the circuit court to hear, as a court, cases in which juries have been waived, its findings, of law and fact, and judgments could not on appeal be reviewed at all since the judge would in that case act rather as an arbitrator. [Boogher v. Insurance Co., 103 U. S. 1. c. 96, 97.] Under the laws of Missouri the referee's findings of fact cannot be said to have been judicially made until approved by the trial court (*Ibid.*, p. 97; R. S. 1909, Sec. 2013), and the findings of the court in cases in which the referee's findings have been set aside are the only findings in the case which have been *judicially* made. We are, therefore, of the opinion that

they support a judgment to the same extent and in the same way, and are not more open to review on the mere weight of the evidence, than any other judgment at law based on findings of the trial court.

At any rate, the contention of appellants' counsel that the trial court had no right to set aside the findings of the referee if those findings were supported by any substantial evidence cannot, in view of the authorities cited and the reasons given, be upheld. Whether there is a discernible difference between the rule laid down by this court that a trial court's action in setting aside a referee's report and making new findings of its own on the evidence reported by the referee is supported by the usual favorable presumption and is not to be overturned unless it appears that the court has abused its discretion (Williams v. Railroad, 153 Mo. l. c. 511), and the rule announced by Judge MARSHALL (Utley v. Hill, supra) and in the cases cited, to the effect that the trial court's findings in such circumstances will not be reviewed at all on the weight of the evidence, need not be decided. In this case the conclusion under both rules must be the same.

(5) It may be added that the rule contended for, even if sound, could not be applied to this case since the referee, after admitting evidence of all transactions from the beginning (1898) reached the conclusion, before making his report, that evidence of happenings prior to the formation of the People's Ice, Storage & Fuel Company was inadmissible and excluded all such evidence from his consideration in reaching his conclusions of fact. The trial court, on the other hand, took this evidence into consideration, and based its findings of facts on the whole of the evidence reported. The bases of the two findings are entirely different, therefore, and that is an important fact in considering any apparent conflict between the findings of the referee and those of the court. It

changes the situation to such an extent that it cannot be said that the record shows that the court and referee differed at all in their conclusions as to the effect of evidence considered. The real difference is as to the admissibility of certain evidence, and that is a question of law.

5. It is insisted that the evidence as to the purposes of the organization of the People's Ice & Fuel Company in 1898 and as to the relation between it and others prior to 1905 was not competent, should not have been considered by the court in making up its findings, and must be disregarded by us in determining whether the evidence supports those findings. It is contended that the allegations in the information that the People's Ice, Storage & Fuel Company was "organized under the laws of Missouri on July 1, 1905," and that "prior to the 1st day of July, 1905, all of the above named companies and co-partnerships, except the People's Ice, Storage & Fuel Company, were engaged in the manufacture and sale of ice in this (Kansas City) vicinity in competition with each other," precluded any investigation reaching back of July 1, 1905. It is also asserted that the same result follows from the fact that (so it is said) there is no direct charge of the existence of a combination prior to said date.

With respect to the effect of the allegation that competitive conditions existed prior to 1905 it is unnecessary, at this stage of the proceedings, to say more than that the allegation is not that such conditions existed in the ice business in Kansas City at all times prior to July 1, 1905, and that we cannot, rightfully, give it such a construction after judgment, to overthrow findings based upon a construction which its language fully warrants.

The ultimate question in this case is, whether or not such an illegal combination existed at any time covered by the charge in the information; and to prove

this we may go back to the very first step in its concoction, and trace the mingling and manipulation of the ingredients which together produce the noxious result. It was held by the Supreme Court of the United States in the late case of the Standard Oil Company v. United States, 221 U. S. 1. c. 46, 47, that the testimony going to acts done even before the passage of the act which made the result to be attained unlawful, was admissible in so far as it tended to throw light upon the acts done after the passage of the act, the results of which, it was charged, were being participated in and enjoyed by the alleged combination at the time of the filing of the bill. Such a combination may be changed in its ingredients by the elimination of some, and the absorption of others which take their place, but we must follow it through these changes to ascertain its nature as it stood upon the day when it is charged to have been unlawful. It may have been re-named and re-labeled, like the People's Ice, Storage & Fuel Company, but it is competent to show by the testimony that, upon its organization it immediately succeeded to the place formerly occupied by a corporation whose properties, contracts, assets, liabilities and *tendencies* it took over, and whose identity it continued in the combination.

The re-incorporation was, according to the testimony of W. H. Winants, the vice-president of the People's Ice, Storage & Fuel Company, effected solely in order to add to the purposes of the old company—not to subtract therefrom. The new company took over and carried out the contracts of the old; contracts which tend, on their face, to show a purpose to restrict competition. The People's Ice & Fuel Company had been organized and employed as a mere *agency* by and through which the purposes of the original agreement among the several ice companies in business in Kansas City in 1898 might be carried out. It was not, nor could it have been, authorized by its

charter to directly or indirectly monopolize the ice business, and in so far as it proceeded to effectuate the plans of other corporations and individuals to do so, it was acting outside its charter powers and in defiance of law. The People's Ice, Storage & Fuel Company was not, nor could it have been, *chartered* to purchase from the People's Ice & Fuel Company any conspiracy to restrict competition in which the latter was engaged, but its subsequent participation in any such agreement cannot be defended on the ground that the agreement or conspiracy was in existence before the corporation was. To hold otherwise is to say that individuals and corporations may conspire to restrain trade and lessen competition, in violation of the statute, and then by subsequently forming a corporation to carry out that conspiracy put themselves and the corporation thus formed beyond the reach of the statute. That the statute can be thus evaded we decline to hold. The People's Ice, Storage & Fuel Company carried out the contracts of its predecessor, making no changes whatever in the methods employed by it, even maintaining, until the failure of the Consumer's Ice Company, the cut price put in force by the old company three or four days before July 1, 1905. Neither is charged with having purchased plants of other companies in order to restrain trade and lessen competition. The Storage Company is charged with having entered into certain contracts and agreements for those purposes, and it does not matter through what gate it entered.

In State ex inf. v. Continental Tobacco Company, 177 Mo. 1, this court said:

"The laws of this State are broad enough to reach individuals who undertake to organize a corporation that would create a trust in itself, but where the corporation is alleged to be duly organized, then the condemnation of the statute as applicable to it is not in the method of its organization; but by its express

terms it denounces and prohibits the unlawful acts, as a legal existing corporation.''

In this case both these elements of illegality are present in the person of the People's Ice, Storage & Fuel Company. It was organized with the intent that it should become the instrument by which the unlawful purpose of its promoters should be carried out, and its profits received and distributed to the conspirators. Such an instrument is, in itself, as is well said by this court in the language above quoted, a trust. Having been organized, its charter powers could, no doubt, have been devoted to honest enterprise, but instead, it took up the work to which it had been devoted by its promoters, and became an active member, as well as agent and instrument, of the conspiracy to eliminate competition in the ice business.

In the case last cited, the grounds on which the court rested its decision are stated in the opinion (l. c. 37) as follows:

''It was a legitimate inquiry by the commissioner as to the integrity and good faith of the transfer by the American Tobacco Company of all its assets to the Continental Tobacco Company, and we have no hesitation in saying, considering the amount involved, the extent and far-reaching scope of the transaction, it was sufficient in itself to arouse in the mind of the Attorney-General a strong suspicion, yes, even a strong probability, that a trust was being created; and warranted his prompt action in the interest of the public, by filing the information herein.

''However, it must be remembered that this proceeding partakes of the nature of a criminal prosecution, severe penalties are imposed, hence it is not sufficient to warrant a finding adverse to respondents, that we may entertain strong suspicions, or even strong probabilities, of their guilt. Such conclusions should only be reached upon a clear showing by the testimony, fully satisfying the minds of the court

that they were guilty of the violations of the law as charged in the information.

"The case of Distilling Company v. People, 156 Ill. 448, is distinguished from this case by reason of the facts. In that case there was a trust formed by a number of unincorporated associations, and as was shown by the testimony, to evade the condemnation of the statute.. This same trust of unincorporated associations incorporated and conducted the business along the same lines, and with a similar purpose. The court said: 'That corporation thus succeeds to the trust, and its operations are to be carried on in the same way, for the same purposes, and by the same agencies, as before.'

"The commissioner, in the case before us, finds the facts just the reverse of the Illinois distilling case. The commissioner, who is one of the circuit judges of this State, has heard the testimony, had the witnesses before him, and reports that from the evidence adduced, there was nothing unlawful in the sale and purchase of the assets of the corporations, as detailed in the report. We will not disturb the finding of the commissioner in that respect."

That there was in existence July 1, 1905, a conspiracy to lessen competition the evidence tends strongly to show, and that there is much evidence that the People's Ice, Storage & Fuel Company, on that date, stepped into the shoes of one of the participants therein cannot be successfully denied. Under the general rule, if a conspiracy exist and another join with the conspirators he "would be deemed a party to all acts done by any one of the conspirators, *before or afterwards,* in furtherance of the common design" (State v. Walker, 98 Mo. 1. c. 105, 106) and no reason appears why this rule is not applicable in this case.

It was held in State ex. inf. v. Standard Oil Company, 218 Mo. 1. c. 458, 459, that it made no difference *where* an unlawful pool, trust or conspiracy in re-

straint of trade was formed, if it was carried out in this State the participants were punishable under our laws. It is also true that it makes no difference *when* such conspiracy is formed, those who engage in it and are found in this State participating in it cannot exculpate themselves by asserting that the plan was not constructed by them in the first instance and that they merely adopted it and joined in its execution. If this be true, and it is, there can be no reason justifying the exclusion of proof of the facts, circumstances and agreements out of which the conspiracy thus entered into took its origin.

6. It is also insisted that the Kansas City Breweries Company, having been organized after the incorporation of the People's Ice, Storage & Fuel Company, cannot be held responsible in this proceeding. That company purchased the assets of the Ferd Heim Brewing Company, which company was one of the participants in the formation of the People's Ice & Fuel Company in 1898 and owned for years its quota of stock in the People's Ice & Fuel Company, and, after July 1, 1905, in the People's Ice, Storage & Fuel Company, that stock belonging to it but being held for it by its president, Joseph J. Heim. Joseph J. Heim also became the president of the Kansas City Breweries Company and then held the People's Ice, Storage & Fuel Company stock for the Kansas City Breweries Company, that company having purchased that stock from the Ferd Heim Brewing Company and having assumed the contract the last named company had entered into with the People's Ice & Fuel Company. At the expiration of that contract, which it carried out, the Kansas City Breweries Company, by its president, Joseph J. Heim (who held the People's Ice, Storage & Fuel Company stock for the Kansas City Breweries Company) entered into another contract with the People's Ice, Storage & Fuel Company for a term of three years from February, 1906. That

Mr. Heim knew the purposes of the People's Ice & Fuel Company and of the People's Ice, Storage & Fuel Company and knew that they were formed and conducted to lessen competition is a fact involved in the findings of the trial court and one there was sufficient evidence to support. In these circumstances, in view of all the evidence, whether the Kansas City Breweries Company had knowledge of the unlawful character of the operation of the People's Ice, Storage & Fuel Company may have been a question of fact (Cook on Corporations, sec. 727), and, if so, there was sufficient evidence to warrant the finding that it had such knowledge. At any rate, it cannot on the evidence be said, as a matter of law, that it did not have such knowledge while it was carrying out the Ferd Heim Brewing Company's contract and when it, by its president, Joseph J. Heim, who held for it its stock in the People's Company, executed the contract of 1906. It is therefore unnecessary to decide in this case whether Joseph J. Heim's knowledge was, as a matter of law, attributable to the Kansas City Breweries Company, though there would seem to be little doubt of that. [State ex. inf. v. Ins. Co., 152 Mo. l. c. 37, *et seq.*]

7. On behalf of the Central Ice Company it is contended, among other things, that there is no evidence to connect it with the operations of any of the other companies, whether they were or were not acting in violation of law. The chief argument made under this head is that the statements of Lyons, president of the Central Ice Company, were not made as the agent of the company and, consequently, were not admissible in evidence. Reliance is placed upon the familiar rule that the declarations of the agent of a corporation do not bind it unless made ''during the continuance of the agency in regard to the transaction then depending.'' The offense with which the defendants were charged was a continuing one. That the purpose in the formation of the People's Ice & Fuel

Company in 1898 was violative of the Anti-Trust Law of the State the evidence leaves no doubt and that there was convincing evidence, circumstantial and direct, that the Central Ice Company was acting in accord with the People's Ice, Storage & Fuel Company, a reference to the statement of facts makes sufficiently clear, and that in a case of this kind circumstantial evidence must usually be the State's chief reliance is apparent.  The existence of a conspiracy being sufficiently proved and the Central Ice Company being charged with being a party thereto, together with other corporate and individual defendants, the declarations of Lyons were undoubtedly admissible to connect him individually with that conspiracy and, under the rule usually applied, his declarations during the existence of the conspiracy (as one of the conspirators), in furtherance of its objects, were admissible against those engaged with him in the common enterprise in the ice business in Kansas City.  It is not necessary, even in a criminal case (State v. Kennedy, 177 Mo. l. c. 118; State v. Sykes, 191 Mo. l. c. 78; State v. Boatright, 182 Mo. l. c. 46) that co-conspirators be indicted and tried together in order to render the acts and declarations of one admissible against the other.  The fact that the Central Ice Company entered into an agreement with the People's Ice & Fuel Company to fix prices was directly testified to by O. W. Butt, who was one of the organizers of the former company, and his testimony was not directly denied by any witness.  Mr. Heim and Mr. Vanderslice denied that the companies of which they were, respectively, presidents (The Kansas City Breweries Company and the Vanderslice-Lynds Mercantile Company), had any agreement with any company to lessen competition or restrict output, but this was short of a denial that the People's Ice & Fuel Company and its successor, the People's Ice, Storage & Fuel Company, were organized for those purposes.  In these circum-

stances, there being ample proof of a conspiracy such as the statute condemns and ample proof, in addition, that the Central Ice Company, after its organization, became a party thereto, the declarations of Lyons, who was the last mentioned company's president and active manager, in furtherance of the object of the combination were admissible and competent evidence in this case. [2 Wigmore on Ev., sec. 1079; Hart v. Hicks, 129 Mo. l. c. 105.]

8. It is insisted that the several Kansas City companies which contracted to sell ice to the People's Ice & Fuel Company and, subsequently, to the People's Ice, Storage & Fuel Company, did not contract their entire output, but, on the contrary, sold quantities of ice to others than the companies mentioned. An examination of the evidence discloses that these companies did sell ice to others, but such examination also discloses that these sales were chiefly made during the spring and fall months, the contracts practically calling for all their output, not required for their own uses, during what is called the ice season—June 15 to September 15 of each year. A monopoly in the ice business during the cold and cooler months is from the nature of things not very practicable as the defendants in this case had sufficient sagacity to know. The control of the business during the warm season was that at which they seem to have aimed. The nature of the commodity is such that surplus artificial ice was not stored to any considerable extent and there is no evidence that any of the defendants attempted to store their surplus to meet the community's requirements during the summer. There being an insufficient demand in the local retail market during the cool weather the defendants naturally attempted to dispose of the surplus from their plants to others than the People's Companies. They did not, however, go into the distributing business, nor did they sell to peddlers to any greater extent than indicated in the

statement. The ice they sold was sold in such quarters that it had no tendency to affect the increased rate made by the People's Ice, Storage & Fuel Company April 1, 1905, and May 1, 1905, for instance. The facts upon which the argument under this head is based are not, in the circumstances, very impressive when relied upon as a refutation of the charge in the information.

9. It is urged that we should give the statute "a reasonable construction" and that it should not be construed to preclude appellants from contracting with each other for the purchase and sale of ice. It is in effect insisted that if it is held that the statute applies to this case practically no transactions between corporations in the same business can escape condemnation. The argument grows out of the separation by counsel of the arrangements and contracts in evidence and a consideration of each independently of the others without reference to the evidence indicating that these transactions were mere parts of a whole which constituted a combination to control the manufacture and sale of ice and the price of it in Kansas City. The assumption that each contract was an independent transaction contradicts the allegations of the information, the weight of the evidence and the findings of the court.

The statute of this State leaves scant room for construction. We are not concerned in this case with any question as to a contract, otherwise lawful, which incidentally restrains trade. The rule applicable in such a case is not applicable in this. Nor is it within our province to give the statute any other meaning than its language imports. Our duty to apply the statute as it is written is as plain as the language of that statute and in that language there is no ambiguity. The statute condemns every direct restraint of trade, great or small. It closes the only door through which doubts as to its construction could enter by positively

prohibiting defined combinations without regard to what the courts may think as to the extent of their effect. The Legislature saw fit to ordain "that competition and not combination" should obtain in business in the State. As long as it moves in its constitutional orbit the judgment of the Legislature is final and the wisdom of its enactments is not open to question in the courts.

The case of Standard Oil Company v. United States, 221 U. S. 1, cannot be relied upon to elicit a different answer to the contention now being considered. In that case it was said, in effect, that the act of July 2, 1890 (the Federal Anti-Trust Act) was inapplicable to combinations and conspiracies in restraint of trade which did not have the effect of restraining trade unreasonably. A considerable portion of the opinion is devoted to the discussion of the question. The court did, however, hold that the Standard Oil Company *unreasonably* monopolized and restrained trade and, consequently, the reason for its discussion of the question as to, what rule might apply when some defendant or combination which but *reasonably* restrained trade might appear at its bar is not apparent. Such discussions under ordinary circumstances are usually termed *obiter dicta* and not regarded as authoritative beyond their intrinsic value as arguments. We need not enter into a discussion of the decision in that case, however, since the rule first stated is established in this State and since our statute precludes all question on the subject.

10. It is not necessary to discuss the complaint that the action of the trial court in ordering the cancellation of certain specified contracts was erroneous. These contracts have expired by their own limitations. The question has become a moot one and will not be considered.

11. It is unnecessary to indulge in an argument on the facts in this case. They are set forth in the

statement with sufficient fullness to show the charac-
ter of the proof made. Of the facts stated there was.
abundant evidence to warrant the findings made by
the trial court and it in nowise. abused its discretion.
in finding as it did. Those findings support the judg--
ment rendered and that judgment ought to be affirmed.
*Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of
BLAIR, C., is adopted as the opinion of the court. All
the judges concur.